M. P. McLEAN, JR., AND McLEAN TRUCKING COMPANY v. N. V. KEITH AND CAROLINA SOUTHERN MOTOR EXPRESS, INC.

(Filed 22 August, 1952.)

1. **Carriers § 5—**

The approval of the Interstate Commerce Commission is prerequisite to the transfer by a common carrier of a certificate of convenience and necessity or the operating rights evidenced thereby, 49 USCA 312 (b) and 5 (2), and where a carrier has executed a contract to convey or a bill of sale, the purchaser's contention that he acquired thereby a vested property interest in the operating rights evidenced by the certificate separate and apart from operating authority thereunder, notwithstanding the want of approval of the transfer by the Interstate Commerce Commission, *is held* untenable.

2. **Same—**

Where a common carrier in Interstate Commerce executes a contract to convey or bill of sale of its rights under its certificate of convenience and necessity, the proposed purchaser has the right to apply to the Interstate Commerce Commission for approval and to have the seller join in such application, and a court of equity will decree specific performance to the extent of compelling the parties to take steps necessary to effectuate the transfer in accordance with the manner and form agreed upon by them.

3. **Same—**

Where a franchise carrier in interstate commerce executes a contract to convey or bill of sale of his rights under his certificate, but the contract expressly stipulates that the transfer should be under the short form procedure set up under section 212 (b) of 49 USCA 312 (b), time being of the essence, *held:* upon compliance by the seller in duly joining in application for approval under the short form, the purchaser, upon the ultimate disapproval of the transfer by the Interstate Commerce Commission upon this application, is not entitled to specific performance to compel the seller to join in application for approval of the transfer under the long form prescribed by 49 USCA 5 (2) (a).

4. **Specific Performance § 1b—**

The remedy of specific performance is available only to compel a party to do precisely what he is obligated to do under the terms of the contract, and it cannot be used to make a new or different contract for the parties simply because the one made by them proves ineffectual.

5. **Same: Contracts § 8—**

Where the parties expressly agreed as to the procedure to be followed to effectuate a contract, it cannot be held, upon such procedure proving in-

effectual, that the parties are under obligation to follow another procedure under the implication that they should do all things necessary to effectuate their agreement, since it is only when the parties do not expressly agree that the law may raise an implied promise.

Appeal by plaintiffs from *Rousseau, J.,* February Term, 1952, of Forsyth.

Civil action instituted by the plaintiffs to establish alleged title to common carrier truck-route operating rights evidenced by certificate of convenience and necessity issued by the Interstate Commerce Commission, and to compel the defendant N. V. Keith by specific performance to comply with the alleged terms of a contract of sale of the operating rights.

The background facts may be summarized as follows: The plaintiff McLean Trucking Company, a corporation, is a common carrier of freight by motor truck for hire, with office and place of business in the City of Winston-Salem, North Carolina. The defendant N. V. Keith, prior to 13 October, 1947, was engaged in a like business under the name of Keith Motor Lines, with office and place of business in the City of Sanford, North Carolina.

The defendant Keith held a consolidated certificate of convenience and necessity issued by the Interstate Commerce Commission covering interstate truck routes through various states on the east coast extending from New England to Florida. For some time prior to 13 October, 1947, McLean Trucking Company, through its president, M. P. McLean, Jr., had been negotiating with the defendant Keith "for the purchase of these truck routes."

As a result of the negotiations, the defendant Keith appeared at the office of McLean Trucking Company on 13 October, 1947, and advised M. P. McLean, Jr., that he would sell his operating rights for the sum of $30,000—$10,000 down and $5,000 a month—but stated that "if he made the deal, he would have to sell that day." He said he "wanted to sell that day so he could buy some other rights." McLean wanted the Keith rights and testified: "I agreed to buy them, if we could . . ."

In this situation the parties were confronted with the problem of complying with the Federal statutes and the rules and regulations of the Interstate Commerce Commission which require the approval of the Commission of a transfer of operating rights from one owner to another before the purchaser may operate under the rights.

Transfers are authorized only under the procedure provided by Section 212 (b) of the Federal Motor Carrier Act of 1935 as amended (49 USCA Sections 312 (b) and 5 (2)). The Act contemplates two types of transfers, and makes provision for procedure to be followed in effectuating a proposed transfer of either type:

McLean v. Keith.

(1) Where less than 20 vehicles are involved or the proposed transfer is to a non-carrier, the procedure is by application under rules of the Commission promulgated pursuant to Section 212 (b) of the Federal Motor Carrier Act of 1935 (49 USCA Sec. 312 (b)). A transfer under this section is controlled by Rule 1 (d) promulgated by the Interstate Commerce Commission 1 December, 1943 (8 Fed. Reg. 12448), which provides: "No attempted transfer of any operating right shall be effective except upon full compliance with these rules and regulations and until after the Interstate Commerce Commission has approved such transfer as herein provided . . ." Applications under this section are referred to in the motor-carrier trade as "short forms." They are relatively simple, requiring a minimum of detailed information, and are usually processed in a relatively short time—"anywhere from a few days up to 30 days."

(2) When more than 20 vehicles are involved and the transfer is to an existing carrier, or to a person affiliated with such a carrier within the meaning of 49 USCA Sections 1 (3) (b), 5 (4) and (5), the procedure is by application under Section 5 of the Interstate Commerce Act as amended (49 USCA Sec. 5 (2) (a)), which provides: "It shall be lawful, with the approval and authorization of the Commission as provided in subdivision (b) . . . for any carrier . . . to purchase . . . the properties, or any part thereof, of another; . . ." Subdivision (b) provides: "Whenever a transaction is proposed under subparagraph (a), the carrier or carriers or person seeking authority therefor shall present an application to the Commission. . . . If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subparagraph (a) and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable: . . ." The obvious purpose of this section is to provide procedure whereby the Commission may investigate carefully proposed purchases, mergers, and operating control among and between carriers for the protection of the shipping public. When this section applies, the parties to the transaction are required to file detailed information with the Commission, and usually a lengthy investigation is required, involving findings and conclusions as to how the public interest and advantage will be affected by the transaction. The result is that it usually requires considerable time for an application under this section (49 USCA Sec. 5 (2) (a)), usually referred to in the motor-carrier trade as a "long form" application, to be disposed of by the Commission. The applicant also is required to submit proof of consistency with the public interest and other matters which are not required in the case of transactions governed by

section 212 (b) of the Motor Carrier Act (49 USCA Sec. 312 (b)), and the regulations prescribed thereunder.

The evidence discloses that both McLean and Keith were familiar in a general way with these requirements respecting the transfer of operating rights. Both parties were motor carriers and also more than 20 vehicles were involved; McLean Trucking Company was operating several hundred, and Keith "approximately nine tractors and twenty-one semi-trailers."

Thus, in neither aspect of Section 212 (b) of the Federal Motor Carrier Act (49 USCA Sec. 312 (b)) was it possible for McLean Trucking Company to purchase the Keith rights under the "short-form" procedure. Therefore, if McLean Trucking Company was to purchase the rights, it was necessary, under pain of violating the penal provisions of the Interstate Commerce Act (49 USCA Sec. 5 (4)), that application for approval be made by long-form application under Section 5 (2) (b) of the Interstate Commerce Act (49 USCA Sec. 5 (2) (b)); and the parties knew that the transfer of the Keith rights could not be made to McLean Trucking Company "on the basis of the short form."

In this situation the evidence discloses that McLean "was in no hurry to get the application through," the inference being that he was willing to follow the appropriate long-form procedure prescribed by Section 5 (2) (b) of the Act. However, Keith "was in a hurry—said . . . if he made the deal he would have to sell it that day," and that it would have to be on the short form. "Mr. Keith said he was going to buy another set of rights and as long as he owned his present Keith rights, . . . he couldn't buy them and get them registered under Interstate Commerce regulations . . ." This was so because if he bought the other rights while still owning his original rights, he then would be a motor carrier in the process of acquiring other rights, and thus under the controlling statute it would be necessary for Keith to use the long-form application in seeking approval of the Interstate Commerce Commission for the purchase of the other rights. Whereas, in order for Keith to be able, within the law, to acquire the other rights under the short-form procedure, it was necessary for him to dispose of his existing rights to a non-carrier, so he himself would then be a non-carrier and as such eligible to purchase other rights under the short-form procedure allowed by the rules of the Commission (49 USCA Sec. 312 (b)).

Clearly this could not be done if McLean Trucking Company was to be the purchaser, because the sale would be governed by Section 5 (2) (b) of the Interstate Commerce Act (49 USCA Sec. 5 (2) (b)). And when that section of the Act applies, a failure to observe its requirements brings into operation the penal provisions of Section 5 (4) of the Act, which provides that: "It shall be unlawful for any person . . . to enter

into any transaction (within the scope of Section 5 (2)) or to accomplish or effectuate, or to participate in accomplishing or effectuating, the control or management in a common interest of any two or more carriers, however such result is attained, whether directly or indirectly, by the use of common directors, officers, or stockholders, a holding or investment company or companies, a voting trust or trusts, or in any other manner whatsoever." (49 USCA Sec. 5 (4)).

An awkward situation was thus presented. Keith wished to sell and McLean to buy, but Keith insisted on selling under the short-form procedure, which appeared to be inappropriate.

In this situation, with Keith insisting on selling that day—"because he wanted part of his money . . . so he could buy these other rights," McLean called into the conference . . . "an Interstate Commerce Attorney from Washington," who, as McLean put it, "said if we got a third party to buy, that he thought it would be all right." The Washington attorney cited as authority for this suggestion the decision of the Interstate Commerce Commission in Roadway Express, Inc.—Merger—Walser Transportation, Inc. (1940), 35 M.C.C. p. 463, in which Roadway acquired the Walser rights through a third-party non-carrier intermediary. In that case the hearing-examiner found "that control and management in a common interest of Roadway and Walser had already been effectuated" in violation of the provisions of Section 5 (4) of the Interstate Commerce Act. However, the Commission overruled the examiner and approved the merger.

Acting upon the advice of the Washington attorney that a third party be procured to make the initial purchase, McLean contacted for that purpose Thomas P. Ravenel, regularly retained attorney of McLean Trucking Company. McLean testified: "It was then that I sent for Mr. Ravenel and called him in. I didn't have to go far to find a purchaser for the rights. He was in the office . . . I had to have . . . somebody else as a purchaser, and I got Mr. Ravenel, one of my employees. . . ." Ravenel made the initial purchase with the understanding that McLean Trucking Company would file a proper application to facilitate the ultimate transfer of the operating authority to the Trucking Company. The arrangement for the sale of the rights was then concluded in the following manner:

(1) Keith and Ravenel executed a written memorandum of contract that day (13 October, 1947), stipulating in substance that Keith contracted to sell and Ravenel to purchase the interstate motor-carrier rights of Keith for $30,000—$10,000 cash and balance of $20,000 in four monthly payments—with the parties agreeing "to submit an application to the Interstate Commerce Commission to consummate the agreement."

(2) Upon execution of the contract, Ravenel that day gave Keith his check for $10,000 as part payment of the purchase price of the rights, and thereafter the additional sum of $20,000 was paid, completing the purchase price according to the terms of the contract.

(3) McLean testified in part: "When the contract between Mr. Ravenel and Mr. Keith was entered into and signed by them . . ., I executed a check for $10,000 and helped Mr. Ravenel raise the $10,000 payment . . . I gave Mr. Ravenel a certified check . . . I know Mr. Ravenel used the check as collateral, and that he borrowed the money to make "his check to Keith good. I was wanting to give it the appearance that Mr. Ravenel was the true and genuine purchaser of these rights; I was not actually the purchaser. I don't think the company was. I furnished the remainder of the money, the other $20,000." (Next day—14 October, 1947—Keith contracted to purchase from the Colonial Motor Freight Lines, Inc., certain motor carrier operating rights evidenced by "N. C. Certificate No. 463-A for the sum of $7,000.00 in cash or certified check upon approval of the Commission.")

(4) On 17 October, 1947, Keith and Ravenel submitted a short-form application to the Interstate Commerce Commission for approval of the sale, and it was approved by the Commission on 13 November, 1947.

(5) After the Commission approved the sale of the rights, Ravenel and Keith, under date of 2 December, 1947, entered into a contract by the terms of which it was agreed that the lines should be operated in the name of Ravenel but with Keith acting as agent and general manager of operations. Operations were begun on this basis, with Keith being paid a fixed salary for his services, and with neither McLean nor McLean Trucking Company having "any control over (operations) whatsoever."

(6) Meanwhile, on 30 January, 1948, in furtherance of the agreement of the parties, McLean Trucking Company and Ravenel executed and filed with the Interstate Commerce Commission a long-form application asking approval for transfer of the operating authority and rights from Ravenel to the McLean Trucking Company.

Thereafter the Interstate Commerce Commission of its own motion instituted a special investigation of the facts surrounding the original purchase and sale of the Keith rights. The purpose of the investigation was to determine whether the original transfer, which had been processed under short-form application and the provisions of Section 212 (b) of the Federal Motor Carrier Act (49 USCA Sec. 312 (b)), was properly the subject of such application and mode of handling. M. P. McLean, Jr., was interviewed by the special investigator of the Commission and made a full disclosure of all the facts respecting the transaction.

While the investigation was in progress the long-form application for approval of the transfer from Ravenel to McLean Trucking Company

was withdrawn by the parties before the Commission took action thereon. It has never been renewed. Operation of the lines by Ravenel was terminated after a period of about six months, and the employment arrangement between Keith and Ravenel was discontinued by mutual consent. There was an operating loss of about $7,000 which was paid and absorbed by McLean Trucking Company. Also, while there was testimony tending to show that Ravenel resigned as attorney for McLean Trucking Company the day the contract was made with Keith, "and had no connection with the Trucking Company during the time he was operating these rights . . .," nevertheless the undisputed evidence shows that Ravenel's retainer continued to be paid by the Trucking Company "until January or February, 1951." After operations were terminated during or about June, 1948, the lines were never operated any more by Ravenel, and the operating authority lay dormant until revived some 18 months later in 1950 by Keith, as hereinafter explained.

On 4 April, 1949, the Interstate Commerce Commission of its own motion formally reopened the original application filed by Ravenel and Keith, which had been approved after informal proceedings under the short-form application, and proceeded to rehear the matters appertaining to that application.

Both McLean Trucking Company and Ravenel participated in the rehearing proceedings. As to this, the record indicates that through counsel both the Trucking Company and Ravenel executed and filed a joint stipulation of facts. This stipulation, with exhibits, covers about nine pages of the record, and concedes and admits the facts surrounding the proposed purchase of the Keith rights to be substantially as herein stated.

Thereafter, and during or about the month of January, 1950, the hearing examiner of the Interstate Commerce Commission filed with the Commission his report containing findings of fact and conclusions thereon, together with draft of an order which he recommended for entry by the Commission. The effect of this recommended order would be to vacate and set aside the previous order of the Commission by which the transfer from Keith to Ravenel was approved, and to dismiss the application.

All interested parties were served with copies of the examiner's report and recommended order, and notice was also given them that unless exceptions should be filed within a stipulated time the recommended order would become the order of the Commission. No exceptions were filed and the order became effective as of 6 March, 1950, and there was no appeal therefrom by either McLean Trucking Company or Ravenel.

After this order of the Commission became final on 6 March, 1950, M. P. McLean, Jr., requested Keith to execute new forms under Section 5

3—236

of the Interstate Commerce Act (49 USCA Sec. 5 (2) (a)), in an effort
to try to effectuate an approval of a transfer of the rights to McLean
Trucking Company, or, as an alternative, to join in a proper petition to
sell the rights to some other purchaser. Keith refused to comply with
these demands, stating he would join in no other petition to transfer the
rights to anyone, and further expressing the intention to keep the rights
as his own. McLean further testified that at one time he offered to resell
the rights to Keith for $25,000, but this offer Keith also refused.

Later, and on or about 13 March, 1950, the defendant Keith with two
members of his family organized the defendant Carolina Southern
Motor Express, Inc., and petitioned the Interstate Commerce Commission
to transfer the operating rights to this corporation. The transfer was
approved by the Commission on 28 April, 1950, and a certificate for the
rights was issued by the Commission to the defendant corporation on
29 May, 1950, and it is now operating thereunder.

Subsequently, by bill of sale dated 14 June, 1951, Ravenel transferred
and assigned all his "right, title and interest in and to" the truck rights
and certificate of convenience and necessity and all of his rights in and
under the Keith-Ravenel contract to M. P. McLean, Jr., and McLean
Trucking Company.

The gravamen of the complaint and relief sought by the plaintiffs is:
that the defendant Keith, as holder of the certificate of convenience and
necessity issued by the Interstate Commerce Commission, owned the
operating rights when the contract of sale was made between Keith and
Ravenel on 13 October, 1947; that title to the rights passed at that time
from Keith to Ravenel; that authority to operate under the rights was
conferred on Ravenel by order entered by the Commission 13 November,
1947, approving the transfer; that while this order was vacated later by
the Commission's order of 6 March, 1950, even so, the effect of the latter
order was only to withdraw from Ravenel his operating authority, with-
out affecting his title to or ownership of the operating rights, thus leaving
title thereto vested in Ravenel; that, therefore, Keith did not own the
operating rights when he attempted later to transfer the rights to his co-
defendant, Carolina Southern Motor Express, Inc.; and that the later
sale for a valuable consideration of these rights by Ravenel to the plaintiff
under date of 14 June, 1951, vested in the plaintiffs the title to the
rights, and that therefore they own title to the operating rights, notwith-
standing operating authority has not been granted to them, but has been
granted to the corporate defendant, by the Interstate Commerce Com-
mission.

Upon these grounds the plaintiffs demand relief on these alternate theo-
ries: First, they assert that Keith's attempt to transfer the operating
rights to the corporate defendant was a nullity and constitutes a cloud

on their title, and they pray judgment that this alleged cloud be removed and that they be declared the "owners in fee" of the "rights . . .," and that "the court enjoin the Carolina Southern Motor Express, Inc., from further exercising or using the rights represented" by the Keith certificate.

Secondly, the plaintiffs urge that, even though they should be denied the other relief demanded, in any event they are entitled, by reason of the contractual relations between the parties, to a decree of specific performance, compelling Keith to join with them in executing such forms and application as shall be required by the Interstate Commerce Commission in order to obtain the Commission's approval of the sale and transfer of the rights to the plaintiffs, to the end that they may obtain from the Commission authority to operate under the rights.

The defendants, answering the complaint by general denials and averments of further defense, insist that the plaintiffs are not entitled to relief of any kind in this action. They also plead laches and illegality of the contract declared upon by the plaintiffs, and set up the further defense that the plaintiffs are not entitled to recover under application of the rule of equity expressed in the maxim that "he who comes into equity must come with clean hands."

At the close of the trial below, after all the evidence was in, the defendant Keith, notwithstanding the plaintiffs did not sue for return of the purchase price of the operating rights, tendered judgment against himself in favor of the plaintiffs in the amount of $30,000, with interest thereon at 6% per annum from 6 March, 1950, until the date of tender, 27 February, 1952, upon the condition that specific performance be not decreed and that all interest in the carrier rights remain in the defendant Carolina Southern Motor Express, Inc.

Also, after each side had rested its case and at the conclusion of all the evidence, the parties, by oral consent as provided by G.S. 1-184, waived a jury trial and agreed that the court might consider the evidence, find the facts, and render judgment without the intervention of a jury. And thereupon the jury was dismissed.

The court, however, upon consideration of the evidence and the argument of counsel, concluded, and so ruled, that the defendants' motion for judgment as of nonsuit, renewed at the conclusion of all the evidence, should be allowed, and judgment was entered accordingly.

At the time of the signing of the judgment of nonsuit, the court permitted the defendant Keith to withdraw the previous tender of judgment against himself and allowed the defendants to substitute in lieu thereof their written tender of payment with the Clerk, under which the defendants paid into the office of the Clerk the sum of $33,600, subject to the terms set out in the tender, which provide in part that the plaintiffs may,

within 30 days after the filing of the opinion of the Supreme Court deciding this appeal, apply for and obtain from the Clerk the moneys so deposited by the defendants, upon condition that the acceptance and receipt thereof by the plaintiffs shall constitute a full and final settlement of all matters in controversy between the plaintiffs and the defendants.

From the judgment of nonsuit entered at the conclusion of the evidence, the plaintiffs appealed, assigning errors.

*W. Dennie Spry, Ratcliff, Vaughn, Hudson, Ferrell & Carter, and Ingle, Rucker & Ingle for plaintiffs, appellants.*

*James E. Wilson, James J. Doherty, York & Boyd, and Womble, Carlyle, Martin & Sandridge for defendants, appellees.*

Johnson, J. Decision here turns on the answers to these questions: (1) In the absence of approval by the Interstate Commerce Commission of the purchase by the plaintiffs of Keith's operating rights, did the plaintiffs acquire a vested property interest in the rights, separate and apart from the operating authority? (2) Was the evidence sufficient to support a decree of specific performance against Keith, requiring him to join with the plaintiffs in a long-form application to the Interstate Commerce Commission asking its approval of the transfer of the operating rights to the plaintiffs?

A study of the record and the controlling authorities impels the conclusion that both questions should be answered in the negative. This being so, it follows that the judgment of nonsuit was properly entered by the trial court. We treat the questions in the order stated:

1. *The Question of Separate Transfer of Operating Rights.*—Here the plaintiffs urge that the operating rights evidenced by an interstate motor-carrier certificate of convenience and necessity may be transferred, separate and apart from operating authority, without the approval of the Interstate Commerce Commission.

However, transfers are authorized only under the procedure provided by Section 212 (b) of the Federal Motor Carrier Act of 1935 as amended (49 USCA Sections 312 (b) and 5 (2)). The Act contemplates two types of transfers—one under short-form procedure pursuant to regulations made by the Interstate Commerce Commission, the other under long-form procedure prescribed by Section 5 of the Interstate Commerce Act as amended (now treated as a part of the Federal Motor Carrier Act by virtue of amendment which repealed Section 213 of the original Motor Carrier Act and substituted therefor the amended Section 5 of the Interstate Commerce Act. See 49 USCA Sections 5 and 312 (b)). And unless and until approval is obtained as prescribed by one or the other of these two modes of procedure, there can be no valid or effective transfer

'by sale of either a certificate of convenience and necessity or the operating rights evidenced thereby. The clear meaning of the controlling statutory provisions seems to be that prior approvel by the Commission is a condition precedent to any such transfer, and until approval is obtained neither the transfer of operating rights nor any other part of the proposed sale may be lawfully consummated. This interpretation is supported by what is said in these decisions: *U. S. v. Resler,* 313 U.S. 57, 85 L. Ed. 1185; *Zabarsky v. Flemings,* 113 Vt. 200, 32 A. 2d 663; *Gregory v. Lewis,* 205 Ark. 68, 167 S.W. 2d 499. See also *Royal Blue Coaches v. Delaware River Coach Lines, Inc.,* 140 N. J. Eq. 19, 52 A. 2d 763,—final appeal 2 N.J. 73, 65 A. 2d 264; *Raymond Bros. Motor Transp., Inc.—Purchase—North American,* 37 M.C.C. 431; *Hoover Truck Co.—Purchase—Frank Johnson,* 37 M.C.C. 507; *Porashnick Local Truck System, Inc.—Purchase—George E. Smith and J. V. Griffin,* 37 M.C.C. 565.

Under the interpretation urged by the plaintiffs, the mere execution of a contract or bill of sale by the holder of a certificate, without sanction or approval of the Interstate Commerce Commission, would permit the creation of a vested property interest in operating rights, separate and apart from operating authority. This would give rise to an awkward situation, wherein one might purchase operating rights and, without prior approval of the Commission, apply to the court for relief on the theory of protecting vested property rights, and thereby indirectly challenge the jurisdiction of the Interstate Commerce Commission and its statutory powers of regulation and control over interstate motor carriers.

The interpretation urged by the plaintiffs not only runs counter to the express provisions of the Federal Motor Carrier Act, but is contrary to the declared purpose of Congress in thereby delegating to the Interstate Commerce Commission the exclusive power to grant operating rights to motor carriers engaged in interstate commerce and in conferring on the Commission broad powers of regulation and control over this branch of interstate commerce (49 USCA Sections 304, 305 and 312); 37 Am. Jur., Sections 115-128 *et seq.* See also *McLean Trucking Co. v. U. S.,* 321 U.S. 67, 88 L. Ed. 544.

Factually distinguishable are the cases cited and relied on by the plaintiffs. The cases on which the plaintiffs chiefly rely as supporting the proposition here urged are: *Re Rainbo Express, Inc., etc.,* 179 Fed. 2d 1, 15 A.L.R. 2d p. 876; *Brown v. Smith et al.,* 32 Tenn. App. 622, 225 S.W. 2d 91; *Costello v. Acco. Transport Co.,* 33 Tenn. App. 411, 232 S.W. 2d 297.

Each of these cases involves, in a bankruptcy or insolvency proceeding, the validity of a chattel mortgage on a motor carrier certificate of convenience and necessity. In substance, the decisions hold that prior approval of the Interstate Commerce Commission is not necessary to the

validity of a chattel mortgage on a certificate as between the mortgagor and his privies and the mortgagee.

The other cases cited on the proposition here urged—principally decisions of the Interstate Commerce Commission—deal with the rights of purchasers at mortgage sales. The gist of these decisions is that on foreclosure the purchaser acquires the right to apply to the Commission for operating approval.

It is true that in basic theory the execution of a chattel mortgage passes legal title to the *res* to the mortgagee. And the plaintiffs, relying upon this theory, call to their aid these decisions in chattel mortgage cases and urge that by analogy it follows that a separate property right is created *ipso facto* by the execution of a contract for the sale of a certificate or the operating rights evidenced thereby. However, this so-called passing of legal title in mortgage transactions is fictional only, as furnishing in legal contemplation a repository and notional vehicle for the later transfer of title, if need be, in case of foreclosure, so as to effectuate the underlying security purposes of the chattel mortgage. Even under this theory, the equitable or beneficial title remains in the mortgagor. In the cited cases, the recognition of this fictional theory of the passing of legal title to the mortgagee means nothing more than that this fictional vehicle carries to the purchaser on foreclosure the right to apply to the Commission for approval of transfer of the operating rights. Such seems to be the rationale of the decisions reached in the cited cases. At any rate, we are not inclined to treat these decisions in cases involving chattel mortgages as authoritative or controlling in support of the proposition that, notwithstanding want of approval by the Commission, as required by statute, operating rights become clothed with the attributes of property in a constitutional sense upon the mere execution of a contract of sale of a certificate of convenience and necessity.

Therefore, if it be conceded *arguendo* that the holder of an interstate certificate of convenience and necessity has a vested property right therein, even so, with the transfer in the present case standing unapproved by the Interstate Commerce Commission, it follows from what we have said that the alleged or proposed transfer of rights to the plaintiffs entitles them in no aspect of the case either to an adjudication of title or to injunctive relief against the defendants as prayed. Accordingly, we do not reach for decision, and it is not necessary for us to discuss, the refinements arising out of the arguments in the briefs respecting whether a certificate of convenience and necessity to operate as an interstate motor common carrier is regarded as a franchise—limited or special—possessing the attributes of property and entitling the holder to the usual constitutional protective safeguards. See, however: 60 C.J.S., Motor Vehicles, Sections 84 (a) and (c); Annotations: 15 A.L.R. 2d 883; 73 C.J.S.,

Property, Sections 1, 2, 13 and 15; *Elizabeth City v. Banks,* 150 N.C. 407, bot. p. 415, 64 S.E. 189; *Coach Co. v. Transit Co.,* 227 N.C. 391, 42 S.E. 2d 398; *Utilities Commission v. McLean,* 227 N.C. 679, 44 S.E. 2d 210; *Atlantic Greyhound Corporation v. North Carolina Utilities Commission,* 229 N.C. 31, 47 S.E. 2d 473.

2. *The Question of Specific Performance.*—While approval by the Commission is a condition precedent to a valid and effective transfer of a certificate of convenience and necessity or operating rights evidenced thereby, nevertheless a failure to secure such prior approval does not leave the proposed purchaser remediless. A contract to convey or a bill of sale, unapproved by the Commission, but otherwise valid, confers upon the proposed purchaser the right to apply to the Commission for approval. *Royal Blue Coaches v. Delaware River Coach Lines, Inc., supra.* Ordinarily, a court of equity will decree specific performance of a valid contract to transfer operating rights evidenced by a certificate of convenience and necessity, to the extent of compelling the parties to take steps necessary to effectuate the transfer, such as making application to the Commission in manner and form as agreed by the parties in making the contract. *Lennon v. Habit,* 216 N.C. 141, 4 S.E. 2d 339; *Watson Bros. Transp. Co. v. Jaffa,* 143 F. 2d 340.

Here, the plaintiffs contend they are entitled to a decree compelling the defendants to join in another application to the Commission— the long-form type of application designated as Form BMC 44 under Section 5 of the Interstate Commerce Act (49 USCA Sec. 5).

However, all the evidence discloses that Keith expressly contracted to sell only under the short-form procedure set up under Section 212 (b) of the Federal Motor Carrier Act (49 USCA Sec. 312 (b)), and all the evidence tends to show he has complied with the contract in this respect. He joined with Ravenel in the short-form application, as agreed and the transfer was approved. This being so, the plaintiffs are not entitled to specific performance. The remedy of specific performance is an equitable remedy of ancient origin. Its sole function is to compel a party to do precisely what he ought to have done without being coerced by the court. 49 Am. Jur., Specific Performance, Sec. 2, p. 6.

Equity can only compel the performance of a contract in the precise terms agreed on. It cannot make a new or different contract for the parties simply because the one made by the parties proves ineffectual. 49 Am. Jur., Specific Performance, Sec. 22, pp. 35 and 36. "The remedy of specific performance is never applicable where there is no obligation to perform," 58 C.J., p. 847, and specific performance does not lie until there has been a breach of contract. 58 C.J., p. 851.

The plaintiffs contend that under all the circumstances it was implied in the terms of the contract that Keith should do all things necessary to

effectuate a transfer to the plaintiffs. The answer to this is that the parties did not leave to implication the matter of procedure to be followed in effectuating the proposed transfer. As to this, they contracted in express terms, and the rule is that there can be no implied agreement where an express one exists. It is only when the parties do not expressly agree that the law may raise an implied promise. *Winstead v. Reid,* 44 N.C. 76; *Lawrence v. Hester,* 93 N.C. 79; 12 Am. Jur., Contracts, Sec. 7.

Accordingly, with no breach of contract being made to appear, the action of the court below in declining to decree specific performance will be upheld. With decision being rested on this ground, it is not necessary for us to discuss the contentions *pro* and *con* treated at length in the briefs respecting whether or not the plaintiffs are barred relief under application of the rule of equity expressed in the maxim that "he who comes into equity must come with clean hands," and these related maxims: *Ex turpi causa non oritur actio,* and *In pari delicto portior est conditio defendentis.*

A study of the record impels the conclusion that the court below followed and applied the pertinent, controlling principles of law and equity and reached the right decision. Therefore the judgment below is
   Affirmed.