## INDIANHEAD TRUCK LINE, INC. v. HVIDSTEN TRANSPORT, INC.

128 N. W. (2d) 334.

May 8, 1964—Nos. 39,035, 39,043.

*Felhaber, Larson & Fenlon, Gustav A. Larson,* and *Thomas M. Vogt,* for appellant.

*Faegre & Benson, Armin M. Johnson, Gordon G. Busdicker,* and *John D. French,* for respondent.

NELSON, JUSTICE.

This is an appeal by defendant, Hvidsten Transport, Inc., a North Dakota corporation, from a judgment of the District Court of Ramsey County in favor of plaintiff, Indianhead Truck Line, Inc., a Minnesota corporation, and from an order denying Hvidsten's motion for a new trial.

The judgment granted specific performance of an agreement dated and signed June 27, 1958, at Fargo, North Dakota, between Hvidsten as seller and Indianhead as buyer. The judgment also awarded damages to Indianhead for the loss it suffered from being wrongfully deprived of benefits it would have received from performance of the agreement.

The agreement provided for the sale and transfer of certain interstate and intrastate operating rights, operating equipment, real estate, and other property. It provided, as a prerequisite to consummation, that approval of the transaction must be obtained from the North Dakota Public Service Commission, the Minnesota Railroad and Warehouse Commission, and the Interstate Commerce Commission.

The agreement was the product of negotiations, drafts, and redrafts extending over a period of time. It contains the following provisions:

"VII. Each of the parties hereto agrees that it will at its own ex-

pense fully cooperate with the other in the prompt filing with the Interstate Commerce Commission of an application under Section 5 of the Interstate Commerce Act and the laws of any states involved which have jurisdiction wherein approval of the transaction covered by this Agreement shall be sought. *Each further agrees that it will fully cooperate with the other in the proper prosecution of said application to a final conclusion before said Commission.*

"VIII. The consummation date of this Agreement shall not exceed thirty (30) days from the date of service of a final order of the Interstate Commerce Commission or any other regulatory body having jurisdiction approving the transaction contemplated by this Agreement. A 'Final Order', as said term is used in this Agreement, is hereby defined to be one from which no further appeal or proceeding may be taken to said Commission or said other regulatory body having jurisdiction.

\* \* \* \* \*

"XV. This Agreement shall be deemed null and void and of no effect whatsoever, and neither of the parties hereto shall be obligated to the other in the event that the Interstate Commerce Commission or any other regulatory body having jurisdiction shall be [sic] its final order deny approval of the transaction covered by this Agreement." (Italics supplied.)

The last provision was necessary since Indianhead could not legally operate under the operating rights covered by the agreement unless and until the relevant commissions approved the transaction. Applications for authorization to transfer operating rights and to consummate the agreement were made to the three commissions. The Minnesota Railroad and Warehouse Commission gave its approval October 13, 1958. The Interstate Commerce Commission gave its approval March 26, 1959. However, the North Dakota Public Service Commission issued an order on December 22, 1958, denying the applications for the transfer of two intrastate certificates of authority from Hvidsten to Indianhead. The order of the North Dakota commission, in the first instance, was based upon the grounds that there was no evidence of the reasonableness of the sales price and that the covenant not to

compete was contrary to the public policy of that state. This order was followed by the filing of a petition for rehearing by Indianhead on January 6, 1959, with respect only to Special Certificate No. 598, the larger of the two certificates. The petition for rehearing was denied on February 16, 1959, and on February 23 Hvidsten advised Indianhead that the contract was no longer in effect. On March 11, 1959, pursuant to statute Indianhead took an appeal to the District Court of Williams County, North Dakota, from the order denying the application and from the order denying the rehearing.

After receiving the initial order of the North Dakota commission denying approval of the agreement, counsel for Indianhead contacted counsel for Hvidsten. Although the agreement required Hvidsten to co-operate in obtaining approval, its counsel indicated to Indianhead that Hvidsten did not intend to petition for rehearing. Prior to filing the petition for rehearing Indianhead submitted to counsel for Hvidsten a copy of the petition showing that the rehearing was sought only as to the larger certificate and that Hvidsten joined with Indianhead in all substantive portions of the petition. The petition itself disclosed that no petition for rehearing would be made as to the smaller certificate, No. 642.

The North Dakota district court remanded the case to the commission for further proceedings. The commission again denied approval for the stated reason that there was no willing seller. Indianhead again appealed to the district court, which on May 10, 1960, again remanded the case to the commission, this time with the following specific findings and order:

"That approval of the proposed transfer in this instance has been unreasonably withheld by the Public Service Commission and its decision in denying the petition to approve the transfer is arbitrary and contrary to the evidence.

"NOW, THEREFORE, IT IS HEREBY ORDERED that the order on rehearing of the Public Service Commission dated August 31, 1959, in its case No. S-1469 denying the transfer of Special Certificate No. 598 from Hvidsten Transport, Inc., as seller, to Indianhead Truck Line, Inc., as purchaser, be and it hereby is REVERSED, and that the matter

be and it hereby is REMANDED to the Public Service Commission for the entry of an appropriate order approving and authorizing such transfer, such order to be entered within 30 days from the receipt of notice of entry of judgment herein."

Following the entry of that order, the North Dakota commission entered an order of approval on July 11, 1960. Promptly, and within 30 days as provided by paragraph VIII of the agreement, Indianhead demanded of Hvidsten that the agreement be consummated, but Hvidsten refused and appealed the second district court decision to the Supreme Court of North Dakota, which dismissed the appeal per curiam on January 26, 1962, on its own motion for the reason that Hvidsten, having sought and obtained approval of the agreement, was not aggrieved. Thereafter, and again within 30 days following the order of dismissal by the supreme court, Indianhead demanded that Hvidsten consummate the agreement, which Hvidsten refused to do. Thereupon, Indianhead commenced this action for a declaratory judgment that the agreement is in full force; specific performance; and damages for the period during which it was deprived of benefits under the agreement.

While at the trial the evidence was presented in the presence of a jury, the trial court thereafter dismissed the jury on the ground that the parties to the action were not entitled to a jury trial as a matter of right. The court found that Indianhead's claims for damages were as follows: Operating profits of Hvidsten from September 1, 1959, to December 31, 1962, of $92,253; net gain realized by Hvidsten on the sale of certain assets subject to the agreement, in the amount of $65,236; estimated operating profits Indianhead would have earned by eliminating duplicating costs, in the amount of $311,120; and miscellaneous expenses incurred by Indianhead in attempting to obtain performance, in the amount of $8,093. The foregoing items totaled $476,702. These items were reduced to $449,822 and allowed by the trial court in that amount. A judgment awarding that sum and decreeing specific performance was entered February 1, 1963.

The crux of Hvidsten's contention on appeal is that, although prompt approval was obtained from the Interstate Commerce Commission and the Minnesota Railroad and Warehouse Commission,

the agreement by its own terms terminated on February 16, 1959, when the North Dakota Public Service Commission, which by its order dated December 22, 1958, had initially denied approval of the agreement, denied the petition for a rehearing. Hvidsten takes this position despite the outcome of the two appeals taken by Indianhead to the North Dakota district court, which reversed the commission in each instance and upon the second appeal remanded the case to the commission with a peremptory order to approve the agreement.

The president of Hvidsten made the following statement regarding Hvidsten's appeal to the Supreme Court of North Dakota:

"I felt that it would be the shortest and quickest way to stop litigation and less expensive and get a final decision to eliminate further expense."

The record shows that the appeal was from the judgment and the scope of the review extended to all the evidence appearing in the record in all prior proceedings before the commission and the district court.

Hvidsten contends the definition of "final order" in paragraph VIII of the agreement must be construed to mean that the parties had in effect agreed that the North Dakota commission's order denying the petition for rehearing should be considered its "final order" and that neither of the parties to the agreement would have any right to appeal to the courts. The record does not support that contention.

Indianhead contends that the agreement between it and Hvidsten is a subsisting and enforceable contract since the agreement was approved by "final order" of the North Dakota Public Service Commission on July 11, 1960, obligating the parties thereafter to render performance. It argues that since Hvidsten nonetheless refused to perform despite timely demands, its refusal to honor its contractual obligations fully justified the court below in granting Indianhead specific performance and damages as additional equitable relief.

Hvidsten argues that the interpretation of the words "final order" contained in paragraph VIII of the agreement is dependent upon the effect of the word "to," which it says is crucial. It contends that, after the commission's denial of the petition for rehearing, further appeals or

proceedings could only be "from" the commission but not "to" it. Thus, Hvidsten reasons that the order of the commission denying a rehearing must be the "final order" of which the agreement speaks. The record of proceedings in the North Dakota litigation shows that this argument is unsound. The order of the commission denying rehearing was followed by two further orders on separate remands from the district court. It is thus obvious that further proceedings "to" the commission following its denial of the petition for rehearing were not only possible but actually occurred. Every time the subject matter of the agreement was brought before the commission, it was taken "to" the commission. Hence, only the last order of the North Dakota commission, which approved the transaction, rather than any prior order concerning it, can be the "final order" to which the agreement refers.

Since the language of the contract is clear and free from ambiguity, under settled canons of construction the parties' own definition of "final order" in the agreement precludes reference to other uses of that term. North Dakota Century Code, § 9-07-02, states: "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." The Minnesota court has held that there is no room for construction of a contract if its language is neither ambiguous, incomplete, nor indefinite. The unequivocal is not to be altered by speculation. Resort ought not to be had to technical usage in order to vary the meaning of language which the parties themselves have otherwise defined. See, Kuhlmann v. Educational Publishers, Inc. 245 Minn. 171, 71 N. W. (2d) 889; Oleson v. Bergwell, 204 Minn. 450, 283 N. W. 770; King v. Dalton Motors, Inc. 260 Minn. 124, 109 N. W. (2d) 51.

The courts have generally observed that an order or judgment becomes final only after the appellate process is terminated or the time for appeal has expired. See, e. g., Ancateau v. Commercial Cas. Ins. Co. 318 Ill. App. 553, 48 N. E. (2d) 440; Matter of Harkavy, 178 Misc. 507, 34 N. Y. S. (2d) 910; Commonwealth v. Jackson, 345 Pa. 456, 28 A. (2d) 894; North East Texas Motor Lines, Inc. v. Texas & P. Motor Transport Co. (Tex. Civ. App.) 159 S. W. (2d) 926.

The foregoing concept of finality has been recognized in Minn. St.

216.25, which governs appeals from the Railroad and Warehouse Commission. That statute states that if an appeal is not taken from an order of the commission, "such order shall become final." North Dakota Century Code, § 28-32-15, which governs appeals from the North Dakota Public Service Commission, offers a perfect contrast between the two uses of the word "final." On the one hand it states that only "final orders or decisions and orders or decisions substantially affecting the rights of parties are appealable." On the other hand, it states that a party to an administrative proceeding may appeal "except in cases where the decision of the administrative agency is declared final by any other statute."

In Minnesota, an order of the Railroad and Warehouse Commission is appealable by the state, by any party to the proceedings, and by any person affected by the order. Minn. St. 216.24. We have said that parties to a contract are presumed to enter into their engagements with reference to the applicable law. See, Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co. 256 Minn. 404, 98 N. W. (2d) 280.

■ An interpretation of the words "final order" as meaning an ultimate and conclusive order is clearly in harmony with the Minnesota and North Dakota rules of appellate review. In North Dakota, where the agreement was executed, the following principle is enunciated by North Dakota Century Code, § 9-08-05:

"Every stipulation or condition in a contract by which any party thereto is restricted from enforcing his rights under the contract by the usual legal proceedings in the ordinary tribunals or which limits the time within which he thus may enforce his rights is void, except as otherwise specifically permitted by the laws of this state."

See, Seher v. Woodlawn School Dist. 79 N. D. 818, 59 N. W. (2d) 805; Restatement, Contracts, § 558; Graham v. Alliance Hail Assn. 47 N. D. 425, 182 N. W. 463.

The subject matter of the controversy brought to the attention of the North Dakota Public Service Commission in the instant case was plainly within the appellate jurisdiction of the North Dakota courts and that jurisdiction could not have been taken away by agreement of the parties. Whenever possible, a contract must receive a construction that

will make it lawful, and where there is a choice between a construction of illegality and one of legality, an intended contractual course of legality is to be presumed in the absence of proof of a purpose to the contrary. See, North Dakota Century Code, § 9-07-08; Hart v. Bell, 222 Minn. 69, 23 N. W. (2d) 375, 24 N. W. (2d) 41; Investors Syndicate v. Baskerville Brothers Holding Co. 200 Minn. 461, 274 N. W. 627.

Clearly, the "final order" of the North Dakota Public Service Commission was the last order issued by it pursuant to the second remand from the district court. We have held in this state that when an order of the Railroad and Warehouse Commission is set aside and vacated by the court upon appeal under Minn. St. 216.25 the matter stands before the commission exactly as if no order had been made. Rock Island Motor Transit Co. v. Murphy Motor Freight Lines, Inc. 239 Minn. 284, 58 N. W. (2d) 723. See, also, Tamiami Trail Tours, Inc. v. Florida R. Comm. 128 Fla. 25, 174 So. 451. Hence, each reversal of the North Dakota Public Service Commission on appeal left the preceding order of the commission without any efficacy whatsoever. Due to the fact that appeals were taken and the action of the commission was reversed, the only order of continuing validity and thus the only "final order" of the commission was the last order issued by it. The earlier orders of the commission had no greater effect than if they had never been entered and therefore could not have effected a termination of the agreement.

Hvidsten contends that the agreement must be construed most strongly against Indianhead as the party which drafted it; but this rule applies only when the terms of a contract are doubtful, ambiguous, or uncertain, which is not true here. Moreover, the record establishes beyond question that the agreement was drafted cooperatively by lawyers for both parties, so the rule would have no application under any circumstances.

■ The agreement provided that the date of consummation should not exceed 30 days from the date of approval of the transaction by "final order" of the relevant regulatory bodies. Therefore, the consummation date was expressly made contingent upon an event entirely indefinite in time. The agreement makes it clear that the parties recog-

nized that some time would elapse before receipt of final approval on the applications from the necessary regulatory bodies and further suggests that they anticipated that the consummation date might even lie in the remote future. Both parties were familiar with the nature of administrative proceedings, as were their lawyers. Long delays are well known to parties as well as lawyers who operate in this field. If time had been a critical factor for either party, they could well, acting cooperatively as they did, have provided for such a contingency in the agreement. They did not provide that the agreement should become null and void if approval by the regulatory bodies was not obtained within a certain maximum time. No such approach was taken, perhaps for the obvious reason that neither party considered the time of consummation to be a matter of major importance.

We think the very fact that depreciation schedules were included in the agreement indicated that the parties expected a substantial passage of time before consummation. The agreement expressly mentioned time in each of the various contexts wherein the parties intended it to have effect. A construction of the agreement to contain a time limitation on the duration of the agreement must therefore be avoided. See, North Dakota Century Code, § 9-07-21; Anderson v. Twin City Rapid Transit Co. 250 Minn. 167, 84 N. W. (2d) 593. It is a familiar practice when time is of the essence of a contract to state that fact in writing. In fact, North Dakota Century Code, § 9-07-23, states that time is considered of the essence only "if it is provided expressly by the terms of the contract or if such was the intention of the parties as disclosed thereby." See, Koller v. State, 74 N. D. 46, 19 N. W. (2d) 822.

Hvidsten also contends that specific performance should not be decreed because the agreement was terminated by failure to obtain simultaneously the necessary final orders of administrative approval required and cites McLean v. Keith, 236 N. C. 59, 72 S. E. (2d) 44, in support of this contention. That case does not apply to the facts here since the performance requested there was not what was called for in the contract. The North Carolina court, however, recognized in the McLean case that equity will ordinarily decree specific performance of a contract to transfer operating rights.

In another case relied upon by Hvidsten, Watson Bros. Transp. Co. v. Jaffa (8 Cir.) 143 F. (2d) 340, specific performance was granted. Specific performance in motor carrier transfer cases has become commonplace even in situations in which the duty to perform has been less clearly stated than in the instant agreement. See, Booth v. Barber Transp. Co. (8 Cir.) 256 F. (2d) 927; George W. Garig Transfer v. Harris, 226 La. 117, 75 So. (2d) 28; Lennon v. Habit, 216 N. C. 141, 4 S. E. (2d) 339.

In McWithy v. Heart River School Dist. 75 N. D. 744, 749, 32 N. W. (2d) 886, 889, it was held:

"A provision in a contract for the termination thereof upon certain conditions can be enforced only in strict compliance with the terms of those conditions. * * * The contract cannot be arbitrarily terminated."

Clearly, the termination provision of the agreement herein has not become operative since all necessary final orders of approval required for consummation eventually were obtained. Since no condition precedent to performance remained unfulfilled within 30 days after July 11, 1960, when the North Dakota commission entered its final order, the agreement cannot arbitrarily be terminated and must stand subject to specific performance.

■ Hvidsten argues also that the contract was terminated because the North Dakota commission never approved transfer of the operating rights covered by Special Certificate No. 642, which under the agreement were to be transferred to Indianhead. It points out that the initial order of the North Dakota commission denied approval of the transfer of either of the North Dakota certificates involved, Nos. 598 and 642, and that the petition for rehearing and subsequent proceedings dealt only with No. 598. Certificate No. 642 permitted only certain shipments to and from Williams County, North Dakota, and it is clear from the record that Hvidsten agreed to the continuation of the proceedings to obtain commission approval only as to transfer of the more important certificate. After such consent it has waived any right to object to the deletion of certificate No. 642 from the agreement and there is nothing about the deletion which in any way invalidates it. The Minnesota dis-

trict court in the trial of this action found with respect to certificate No. 642 as follows:

"The Agreement as executed covered North Dakota Certificate No. 642. The evidence shows, however, that this certificate, included in the original application to the Public Service Commission of the State of North Dakota and in the initial order denying the application, dated December 22, 1958, but not included in the petition for rehearing filed by Indianhead nor in any subsequent proceedings in North Dakota, was deleted and removed from the Agreement by the acquiescence and tacit agreement of Hvidsten. The evidence shows that Hvidsten was informed of Indianhead's intention not to seek rehearing of the initial order of the Public Service Commission denying the application with respect to this certificate. Both by operation of law and on the basis of the testimony, Hvidsten agreed to this action on the part of Indianhead and in addition, by failing to make objection to this removal of Certificate No. 642 has waived any right now to object to such removal, and the evidence does not show that its retention places any burden on Hvidsten."

Hvidsten's appeal to the Supreme Court of North Dakota from the judgment requiring the commission to approve the transfer of certificate No. 598 was dismissed. There is ample support for the ruling that Hvidsten had requested this action. We are bound to recognize, as the court of North Dakota did, that the parties had agreed to act together and cooperate in all efforts to obtain commission approvals of the agreement.

The record is clear that Hvidsten failed to cooperate at a time when the orders of the North Dakota Public Service Commission were not final within the meaning of paragraph VIII of the agreement and also that a copy of the petition for rehearing was furnished to counsel for Hvidsten for his review prior to submission to the commission. The petition recited that "applicant to buy intends to file no petition for rehearing" as to Special Certificate No. 642. It also recited:

"It is the understanding of undersigned counsel that the applicant to sell will join in this petition for rehearing at least as concerns para-

graphs I, II, III and V hereof and that it will also join affirmatively in the request for rehearing and in the request that the transfer of Special Certificate No. 598 be consummated as requested in the application in this case."

In its order on the petition for rehearing the North Dakota commission was able to conclude "that the seller now intends to retain Special Certificate No. 642."

There is no evidence indicating that Hvidsten objected to the deletion of certificate No. 642 from the agreement. Rather, there is conclusive proof that the deletion resulted from Hvidsten's approval of the proceedings to obtain commission approval only as to certificate No. 598. Indianhead acted upon this agreement and took no further action by way of petition for rehearing or appeal with respect to certificate No. 642. That certificate was therefore removed from the case when the initial order of the commission refusing approval became final, and Hvidsten has waived any right to claim that the agreement requires its transfer. Malmquist v. Peterson, 149 Minn. 223, 183 N. W. 138; Bohlig v. First Nat. Bank, 233 Minn. 523, 48 N. W. (2d) 445.

North Dakota Century Code, § 9-09-06, permits modification of a written contract by an executed oral agreement. The record proves such an oral agreement and we think the standard of proof required was present. See, Murphy v. Anderson, 128 Minn. 106, 150 N. W. 387; Oertel v. Pierce, 116 Minn. 266, 133 N. W. 797, Ann. Cas. 1913A, 854.

While the record indicates that the parties themselves modified the agreement with respect to certificate No. 642, whether or not they did agree to delete it is of minor importance.

"* * * It is a well-recognized principle of equity that a vendee, in an action brought by him for specific performance of a contract, may waive the performance on the part of the vendor of portions of his contract, and may elect to take a partial performance, if he himself is willing to perform fully." 49 Am. Jur., Specific Performance, § 102.

See, also, Kies v. Warrick, 149 Minn. 177, 182 N. W. 998; North Dakota Century Code, § 32-04-08.

■ Hvidsten also contends that the agreement is illegal and unenforceable on the ground that it contains an unlawful covenant not to compete, which in effect is in restraint of trade.

On the same date that the agreement was executed, Indianhead and Carl M. Hvidsten (president of Hvidsten) as an individual signed a covenant not to compete which would preclude Carl M. Hvidsten personally, for a period of 5 years, from engaging in business in competition with Indianhead as a motor carrier in the States of North Dakota, South Dakota, Iowa, Minnesota, and Wisconsin. Hvidsten contends that, since the covenant was executed by both parties in North Dakota, the law of that state must be applied in determining its validity, citing Larx Co. Inc. v. Nicol, 224 Minn. 1, 28 N. W. (2d) 705; Heflebower v. Sand (D. Minn.) 71 F. Supp. 607; and North Dakota Century Code, § 9-08-06, which provides in effect that every covenant not to compete is void, with certain exceptions, one of which provides:

"One who sells the goodwill of a business may agree with the buyer to refrain from carrying on a similar business within a specified county, city or village, or a part of either, so long as the buyer or any person deriving title to the goodwill from him carries on a like business therein."

A provision in the agreement called for the execution of this covenant. Hvidsten argues that the covenant is illegal under § 9-08-06 and that the entire agreement was therefore void from its inception.

The interpretation placed upon the foregoing statute by Hvidsten was rejected in Olson v. Swendiman, 62 N. D. 649, 652, 244 N. W. 870, 871, in which the Supreme Court of North Dakota said:

"* * * That part of the contract which provides that the plaintiff shall not engage in the practice of dentistry in East Grand Forks, Minnesota, would, under this statute, be void. However, it is well settled that that part can be separated from the part which restrains the plaintiff from practising in Grand Forks, North Dakota, and if the latter is reasonable it would be valid."

See, also, General Paint Corp. v. Seymour, 124 Cal. App. 611, 12 P. (2d) 990; Zajicek v. Koolvent Metal Awning Corp. (9 Cir.) 283 F.

(2d) 127, certiorari denied, 365 U. S. 859, 81 S. Ct. 827, 5 L. ed. (2d) 823.

The general rule is stated in 5 Williston, Contracts (Rev. ed.) § 1659:

"Contracts containing promises unlawful because of too extended restrictive effect have not been held so unlawful in their general purpose as to invalidate the whole transaction of which they were a part; and the fact that a covenant in restraint of trade is more extended than the law allows will not preclude the enforcement of separable lawful restrictive promises."

It is to be noted that the present proceeding does not involve or depend in any way upon the covenant not to compete. Indianhead is not seeking to enforce the covenant, and this proceeding in no way validates it. See, Restatement, Contracts, § 603; Kosuga v. Kelly (7 Cir.) 257 F. (2d) 48, affirmed sub nom. Kelly v. Kosuga, 358 U. S. 516, 79 S. Ct. 429, 3 L. ed. (2d) 475, rehearing denied, 359 U. S. 962, 79 S. Ct. 796, 3 L. ed. (2d) 769.

Erickson v. North Dakota State Fair Assn. 54 N. D. 830, 211 N. W. 597, and Mandan-Bismarck Livestock Auction v. Kist (N. D.) 84 N. W. (2d) 297, relied upon by Hvidsten, are distinguishable and not controlling here.

The court below found that this covenant has already been effectively waived by Indianhead and that the waiver imposes no burden upon Hvidsten; also that such waiver had been acquiesced in by Hvidsten by reason of its failure to make objection thereto in any subsequent proceedings before the North Dakota Public Service Commission and the courts of North Dakota. The validity of such waiver is recognized in 6A Corbin, Contracts, § 1525, p. 775, and in Restatement, Contracts, § 297. We therefore conclude that Hvidsten's argument that because of the illegal character of the covenant not to compete it can avoid its obligations under the agreement is without merit.

We reach the conclusion also that the defenses urged by Hvidsten, namely, (1) that the contract terminated when the North Dakota Public Service Commission denied Indianhead's petition for rehearing after refusing to approve the transaction contemplated by the agreement;

(2) that the contract terminated because the commission never approved transfer of all operating rights initially involved; and (3) that the contract was illegal and unenforceable because of the inclusion of the personal covenant of Carl M. Hvidsten not to compete, are barred by the prior proceedings and litigation in North Dakota.

Clearly, the validity of the agreement was in issue in the North Dakota proceedings. The existence of a valid contract was essential to the result reached, and we therefore conclude that the North Dakota disposition of the litigation between the parties there and the judgment there obtained is determinative of that question. See, Bernstein v. Levitz, 223 Minn. 46, 25 N. W. (2d) 289; Gollner v. Cram, 258 Minn. 8, 102 N. W. (2d) 521, 83 A. L. R. (2d) 971.

What Hvidsten hoped to attain by its appeal to the North Dakota Supreme Court was finality, but that finality resulted in foreclosing further argument concerning the agreement's validity.

■ Hvidsten asserts that the action of the court below in dismissing the jury at the conclusion of the testimony was an obvious violation of its right to trial by jury. The scope of a party's right to trial by jury in this state is defined in Rule 38.01, Rules of Civil Procedure, as follows:

"In actions for the recovery of money only, or of specific real or personal property, or for a divorce on the ground of adultery, the issues of fact shall be tried by a jury, unless a jury trial be waived or a reference be ordered."

Since this rule neither enlarges nor diminishes the historical right to a jury trial, to sustain Hvidsten's position it would have to be shown that an equity court could not grant the relief extended by the trial court over the objections of a party demanding a jury trial. Hvidsten argues that it was entitled to a jury trial because Indianhead sued for damages for breach of contract. Such was not the suit brought. Indianhead brought suit for specific performance of the agreement, and, in addition, as a part of the equitable relief sought, monetary damages for the limited period between the time when it contends Hvidsten wrongfully prevented consummation of the agreement and the time of trial. The award of interim damages in this case is not to be

classed as an award of damages for breach of contract. On the contrary, the basis of Indianhead's suit is that the contract remains in full force and effect and subject to performance. This distinction is pointed out in Annotation, 7 A. L. R. (2d) 1204, 1206, as follows:

"The compensation awarded as incident to a decree for specific performance is not for breach of contract and is therefore not legal damages. The complainant affirms the contract as being still in force and asks that it be performed. He cannot have it both ways, performed and broken. The situation is simply that, if the court orders it to be performed, the decree must as nearly as possible order it to be performed according to its terms, and one of those terms is the date fixed by it for its completion. This date having passed, the court, in order to relate the performance back to it, equalizes any losses occasioned by the delay by offsetting them with money payments. Often the result is more like an accounting between the parties than like an assessment of damages."

See, also, Greenstone v. Claretian Theological Seminary, 173 Cal. App. (2d) 21, 343 P. (2d) 161, where the court upheld a decree for specific performance and damages; and Abrahamson v. Lamberson, 79 Minn. 135, 81 N. W. 768, where the plaintiff vendee under a contract for the sale of land brought an action against the vendor for specific performance and for damages for the period during which he was wrongfully deprived of possession. This court specifically held in that case that such award of damages was properly within the power of a court of equity.

We said in Haugland v. Canton, 250 Minn. 245, 253, 84 N. W. (2d) 274, 280:

"* * * Clearly the complaint in the instant case was directed primarily toward equitable relief. Simply because damages were awarded on a relatively collateral issue did not change the basic nature of the action since, when a court of equity once acquires jurisdiction, it will grant full relief, including damages."

The Supreme Court of North Dakota, in Orfield v. Harney, 33 N. D.

568, 580, 157 N. W. 124, 127, an action for specific performance and damages, stated:

"* * * And the power of the court, in the same action, to decree specific performance, and also to award damages to compensate the plaintiff for the injury sustained by reason of a vendor's delay in conveying, is generally recognized and has received the sanction of this court. [Citations omitted.]"

See, also, Van Dusen v. Bigelow, 13 N. D. 277, 100 N. W. 723, 67 L. R. A. 288; Frank v. Coyle, 310 Mich. 14, 16 N. W. (2d) 649.

We said in Koeper v. Town of Louisville, 109 Minn. 519, 522, 124 N. W. 218:

"* * * The rule in cases of this kind is that in an action not of a strictly legal nature, where the plaintiff seeks both equitable and legal relief, neither party is entitled to a jury trial as a matter of right."

Hvidsten has cited Raymond Farmers Elev. Co. v. American Surety Co. 207 Minn. 117, 290 N. W. 231, 126 A. L. R. 1351; Morton Brick & Tile Co. v. Sodergren, 130 Minn. 252, 153 N. W. 527; and Coughlin v. Farmers & Mechanics Sav. Bank, 199 Minn. 102, 272 N. W. 166, in support of its contention that it was entitled to have a jury pass upon Indianhead's claim for damages in the interim period from September 1, 1959, to January 1, 1963. As we read these cases we are unable to find any substantial support for Hvidsten's position. Support is in fact found even in those cases for the rule that, where the plaintiff seeks both equitable and legal relief neither party is entitled to a jury trial as a matter of right. Hvidsten also cites Federal decisions and cases from other states, but those decisions arose under constitutional and statutory provisions different from those of Minnesota and therefore appear to have no bearing upon the scope of a jury trial in this state. The right to a jury trial in this state obtains only with respect to cases of the type outlined in Rule 38.01, Rules of Civil Procedure. We think it is clearly established that Hvidsten had no right to a jury trial in the proceedings below.

■ We now come to a consideration of the damages awarded by the trial court. Hvidsten contends that the trial court adopted the wrong

date in computing the damages awarded. Upon examination of the record and the findings of the trial court, it appears to have been properly found that the parties to the agreement made joint application to the Public Service Commission of North Dakota on August 7, 1958, for authorization to transfer and sell the operating rights issued by the commission and to consummate the agreement. The trial court found that, while Indianhead had remained ready, willing, and able to consummate the agreement at all times and had made demands accordingly, Hvidsten had given the impression of being an unwilling seller, causing the North Dakota proceedings to become involved and protracted and to result in the order of that commission filed August 31, 1959 (which denied approval on the grounds that Hvidsten was an unwilling seller). Following the appeal to the district court necessitated by that order, the final order of approval was entered by the Public Service Commission July 11, 1960. It is Hvidsten's contention now that damages should not have been allowed prior to 30 days following the entry of that order since under the contract 30 days from the date of the final order was allowed for consummation. The trial court, however, could and did find that, notwithstanding the specific agreement of Hvidsten to cooperate with Indianhead in obtaining approval of the necessary governmental authorities to sell and transfer the properties covered by the agreement, Hvidsten wrongfully and without cause or justification sought to avoid performance of its obligations under the agreement. Such activities by Hvidsten began as early as September 8, 1958, and upon the record the trial court was justified in adopting September 1, 1959, as the date from which any award of damages should be computed.

Hvidsten contends that the damages are in most respects excessive. It objects vigorously to the award of miscellaneous expenses in the amount of $8,093, consisting in part of time spent by some of Indianhead's officers in seeking consummation of the contract; clerical and office expense; interest on an escrow deposit; and attorneys' fees amounting to $2,320. The trial court found that these expenses were incurred by Indianhead due to Hvidsten's refusal to perform between September 1, 1959, and May 31, 1962. An allowance made under

somewhat similar circumstances was approved in Bergquist v. Kreidler, 158 Minn. 127, 196 N. W. 964. We think that these expenses were properly awarded under the particular circumstances here involved.

We are impressed, however, with Hvidsten's contention that a large part of the damages awarded for alleged lost profits are remote and speculative. Hvidsten's argument applies especially to the trial court's award of $311,120 for lost profits based on alleged savings in operating costs between September 1, 1959, and January 1, 1963, which Indianhead claims it could have made if the contract had been consummated as was intended at the time the agreement was entered into. Hvidsten cites in support of its contention that these damages were unjustified the case of Weiss v. Revenue Bldg. & Loan Assn. 116 N. J. L. 208, 182 A. 891. Plaintiff there had operated an apartment building leased from defendant and had an option to lease an adjacent apartment building. Defendant refused to recognize the option, and plaintiff claimed damages based on alleged economies which he might have made if the two adjacent units had been operated together. In its discussion of that question the New Jersey court said (116 N. J. L. 211, 182 A. 893):

"* * * It is pointed out that the lessee contemplated the operation of the two houses as one unit, and that this would permit economies and other advantages translatable into pecuniary profit not possible if they were widely separated * * *. But, assuming that lost profits were within the contemplation of the parties as the measure of damage, the claimed anticipated profits were not so certain and definite as to be the legally deducible consequences of the breach."

We are of the opinion that the award of $311,120 is so demonstrably speculative and remote as to prevent establishing the sum as the legally deducible consequences of Hvidsten's failure to perform the agreement and that said amount must therefore be stricken from the amount of damages awarded.

The judgment with respect to the award of $311,120 for such profits

is reversed and remanded to the trial court for correction in compliance with this opinion. In all other respects it is affirmed.

Affirmed.

MR. CHIEF JUSTICE KNUTSON took no part in the consideration or decision of this case.