Harold A. CHARLES, Appellant,

v.

Ernestine and Lowell D. HILL, Husband and Wife, Respondents.

No. 46895.

Supreme Court of Minnesota.

Nov. 25, 1977.

Larkin, Hoffman, Daly & Lindgren and Andrew W. Danielson, Minneapolis, for appellant.

Field, Arvesen, Donoho, Lundeen & Hoff and Thomas S. Donoho, Fergus Falls, for respondents.

Heard before PETERSON, MacLAUGHLIN, and YETKA, JJ., and considered and decided by the court en banc.

YETKA, Justice.

Plaintiff, Harold A. Charles, commenced this action for specific performance of an agreement giving him an option to purchase 320 acres of farmland in Stevens County. The trial court found no consideration for the agreement and dismissed plaintiff's cause of action on the merits. We reverse.

The farmland at issue in this case was owned by Ernest H. Charles (decedent), the father of Erland Charles, plaintiff Harold Charles, and defendant Ernestine Hill. Harold, the youngest of the siblings and the only one living at home by the time he graduated from high school in 1950, worked the farm with his father until 1957, when his father retired. Since then, Harold has worked the farm himself, paying rent to his father until his father's death in 1965 and thereafter to his stepmother.

At the time of his death, decedent owned in fee simple 320 acres of farmland in Stevens County which comprised his entire probate estate. He also owned 80 acres in joint tenancy with Ruby Charles, his second wife and the stepmother of his three children. By his will, decedent devised a life estate in the 320 acres to Ruby and the remainder to his three children. He gave Harold an option, to expire 6 months after decedent's death, to purchase the remainder interest in the 320 acres for $60,000, to be divided equally among Harold, Ernestine, and Erland. In the event Harold did not exercise the option, the will provided that Harold should have a "valid claim" against the estate for the cost of any permanent improvements which he had made on the land.

With respect to the 80 acres held in joint tenancy, the will provided that if Ruby predeceased decedent, Erland should have a 6-month option to purchase the 80 acres from the executor of decedent's estate for $12,000, to be divided equally among the three children. Decedent expressed in his will the wish that, should Ruby survive decedent, she would allow Erland 6 months after decedent's death within which to buy the 80 acres according to the previously described terms.

Shortly after decedent's death, the will was read to the surviving members of the family. Ernestine objected to the exercise of Harold's option on the grounds that Harold would thereby deprive Ruby of the life estate which decedent wanted Ruby to have. For some time after that, the family members shared the misapprehension that the exercise of Harold's option would cut off Ruby's life estate in the family farm.

Harold did not exercise his option to purchase within the 6 months following his father's death, nor did he file a claim against the estate. On September 27, 1966, 14 months after decedent's death, the final decree of distribution of decedent's estate was entered. The decree provided that a life estate in the 320 acres be assigned to and vested in Ruby and that the remainder interest be assigned to and vested in the three children.

On the same day as entry of the decree, Harold, Harold's wife, Ruby, Erland, and Erland's wife signed an agreement drafted by the attorney who handled the final stages of the probate of decedent's will. The agreement provided for a distribution of rights in the devised land different from the distribution under the terms of the decree. In effect, the agreement revived Harold's expired option, gave Erland an option on the 80 acres, and made both options effective until 6 months after Ruby's death. It gave Ruby a life estate in the cash proceeds payable upon exercise of the options and the three children remainder interests in those proceeds. Under the terms of the agreement, both options were on the fee interest, not merely the remainder, but the prices remained, respectively $60,000 and $12,000. In the event either Erland or Harold did not exercise his option, he would be allowed a claim against the real estate for

the cost, less depreciation on a 20-year schedule, of any improvements made by them. The agreement itemized some $12,-000 in improvements which Harold had made since the will was executed.

The agreement states that the parties so agreed because

" * * * it is obvious that said purchases and division of monies as provided in said Will would be unfair to the surviving spouse, Ruby I. Charles, in that it would deprive her of her life estate income in said real estate."

The agreement further states: "This agreement is made for the purpose of just interpretation of the intent and purpose of the Last Will and Testament of Ernest H. Charles as between all parties concerned." After Harold, Harold's wife, Ruby, Erland, and Erland's wife signed the agreement, Erland was delegated the responsibility of telephoning Ernestine in Oregon to advise her of the agreement which would be sent for her signature. Ernestine testified that Erland said to her: "I'm not asking you to sign this, but we need to do it to give Ruby life estate." According to Ernestine, Erland also mentioned that he himself would be given a firm option in place of the precatory language contained in decedent's will and that he knew Ruby had $30,000 that she intended to divide between him and Ernestine to make the distribution under the will more equitable. Ernestine testified that no mention was made of any claim held by Harold. Erland's testimony corroborated Ernestine's account of their telephone conversation, except that he said he did not mention any specific sum of money which Ruby intended to bequeath them.

The agreement was sent to Ernestine, and she and her husband, defendant Lowell Hill, signed it on October 3, 1966. At trial, Ernestine testified that she would not have signed the agreement if she had not thought the agreement necessary to insure a life estate for Ruby. She would not have signed it for the purpose of giving an option to Erland. In Ernestine's view, Erland was capable of taking care of his own affairs and Ruby was free to dispose of the 80 acres which she owned as she saw fit.

After the agreement was signed, Harold continued to rent the 320 acres from his stepmother, paying $3,600 a year in rent until 1972. He increased the rent about 10 percent in each of the subsequent years, paying about $5,000 in 1975. Harold continued to make substantial improvements on the land. Also, during those years since execution of the agreement, he purchased a neighboring farm.

In May of 1974, almost 8 years after execution of the agreement, Erland expressed an interest in exercising his option to purchase. Upon learning of Erland's proposal, Harold decided that he too would like to exercise his option. Ernestine requested that they both refrain from acting until she could come to Minnesota to discuss the purchases with them. She arrived soon after and urged Ruby to convey Ruby's 80 acres to Erland, but Ernestine refused to convey her own remainder interest in the 320 acres to Harold on the grounds that the land was worth substantially more than $60,000. Ruby conveyed the 80 acres to Erland. Ernestine returned to Oregon without conveying her interest in the 320 acres to Harold.

Harold thereafter commenced this action for specific enforcement of the agreement. Ernestine and her husband defended on the grounds of lack of consideration for the agreement and mutual mistake. Harold argues that there was consideration and, alternatively, that defendants are estopped from arguing no consideration.

Harold argues that under the "doctrine of family settlements," which he contends the trial court erroneously failed to apply, "[m]utual promises, compromises and releases between family heirs are sufficient consideration to support a family settlement agreement even in the absence of family dispute." The parties agree that there was no "dispute" in this case such that its settlement would constitute consideration for the agreement. In view of our determination that adequate consideration otherwise existed, however, we need not now decide that issue.

■ Under his father's will, Harold was given either an option to purchase the remainder interest in the farm or, alternatively, a "valid claim" against the estate for the value of improvements made after the date of the will's execution. At the time of decedent's death, Harold had made approximately $12,000 worth of improvements. Since he did not exercise the option, Harold had a "valid claim" against the estate for that amount.

■ Defendants assert that because Harold failed to file this claim within 4 months following the probate court's order for hearing on the probate of the will, the claim was absolutely barred by operation of Minn. St.1974, § 525.411. Since the agreement extending Harold's option was not drawn up until September 27, 1966, more than 9 months after the expiration of the filing period, the claim was then completely nonenforceable and could not constitute consideration. Defendants' argument, however, rests on the proposition that Harold's "valid claim" was a "claim against a decedent arising upon contract" under Minn.St. 525.411. Were this proposition conclusively established, the argument would be more sound, for, while forbearance of a doubtful claim is sufficient to support a contract, *Thayer v. Knight,* 210 Minn. 171, 297 N.W. 625 (1941); *Schultz v. Brennan,* 195 Minn. 301, 262 N.W. 877 (1935), "a wholly baseless or utterly unfounded claim is not consideration." *Nybladh v. Peoples State Bank of Warren,* 247 Minn. 88, 96, note 11, 76 N.W.2d 492, 498 (1956). Nevertheless, at the time the agreement was executed, the question whether Harold's "valid claim" was barred by § 525.411 had not been answered.

■ Harold could reasonably have contended that the will provided him not a "claim against a decedent arising upon contract," but rather a bequest of an amount equal to the value of the improvements he had made. His father clearly wished to compensate him for those improvements, and may have been attempting to relieve Harold of the burden of filing and proving a creditor's claim by making a gift under

the will. Such an interpretation of the will is consistent with the limited option exercise period and with the testator's intent to reward his son.

If Harold's claim was not barred by § 525.411, it could have been brought before the probate court at the time the agreement was executed. Under Minn.St. 525.02 the court could correct, modify, vacate, or amend its decree "[w]ithin the time for taking an appeal, for the correction of judicial error," or within 2 years "for excusable neglect, inadvertance or mistake." Thus, had Harold presented his claim to the court at the time the agreement was executed, it was within the court's power to give effect to the will in the manner outlined above.

Although Harold's claim was not conclusively barred, it would not be consideration for the agreement unless Harold agreed to forbear its assertion and that forbearance was bargained for. *Cederstrand v. Lutheran Brotherhood,* 263 Minn. 520, 117 N.W.2d 213 (1962). The agreement provided that Harold could exercise his option to purchase the farm "during the lifetime and for six months after the death of Ruby I. Charles; * * * however, if he does not purchase within the time set forth hereinabove, he shall have a claim against the proceeds of said real estate and a lien against the real estate itself, for the costs of improvements made * * * ." While Harold could exercise the option until 6 months after the death of Ruby, the agreement conditions his power to assert a claim for improvements on his not exercising the option within the specified period. This condition could not be fulfilled until the expiration of that period. Thus, the agreement requires Harold to forbear assertion of his claim.

Defendants contend that Ernestine signed the agreement only because she believed it was necessary to protect Ruby's life estate and that since Harold's assertion of his claim would not have deprived Ruby of her estate, his forbearance was not the consideration bargained for. Yet, Ernestine was present at the reading of the will, and the provisions of the will were included in the agreement which she signed. She

knew that Harold's option expired 6 months after their father's death. The only manner in which Ruby's life estate could be endangered was by Harold's asserting his claim for improvements.

The attorney who drafted the agreement, and upon whose advice the parties to the agreement relied, testified by way of deposition that he understood that since the estate of decedent was without liquid assets, the farm could have been sold to satisfy Harold's claim. This understanding was correct. Minn.St.1974, § 525.63, provided in part:

> "The court may direct a sale, mortgage, or lease of any real property of a decedent when the personal property is insufficient to pay * * * bequests * *. The proceeds of any such sale, mortgage, or lease which may be available for distribution shall be distributed to the same persons and in the same shares as if it had remained real estate."

Under this provision, if the farm had been sold, Ruby Charles would have received from the proceeds the full present value of her life estate. *In re Estate of Paulson*, 208 Minn. 231, 293 N.W. 607 (1940). Such proceeds, however, might not have been sufficient to provide Ruby an income equal to that which she could have received from the farm itself. Thus, not only would she have lost her life estate in the farm, but also her "life estate income" would have been endangered.

Ernestine Hill signed the agreement in order to protect her stepmother's life estate. Harold's forbearance in asserting his "valid claim" removed any danger, however remote, that the farm would be sold to satisfy Harold's claim. Thus, Ernestine received precisely that for which she had bargained, and Harold's forbearance constituted valid consideration for the agreement. Because the agreement was supported by consideration, the option was irrevocable and Harold's request for specific performance should have been granted.

Reversed and remanded to the trial court with instructions to enter a decree of specific performance in favor of plaintiff and for such further orders as may be necessary to transfer title to Harold A. Charles.