Howard B. CARSTEDT, Appellant,

v.

Gordon L. GRINDELAND, et al., Respondents.

No. 50669.

Supreme Court of Minnesota.

April 3, 1981.

Williamson, Bains, Moore & Hansen, Malcolm L. Moore, and Herman H. Bains, Minneapolis, for appellant.

Leonard, Street & Deinard, Harold D. Field, Jr., and Robert Lewis Barrows, Minneapolis, for respondents.

TODD, Justice.

Howard Carstedt, a printing press mechanic, developed an apparatus known as a decurling bar which effectively increased the productivity of printing presses. Gordon Grindeland was engaged in the business of marketing a device he had developed for the printing industry. On hearing of Carstedt's device, Grindeland sought out Carstedt. Carstedt filed a patent application and the parties entered into a licensing agreement. Grindeland began to market the decurler successfully and paid royalties to Carstedt. Thereafter, he was notified of a claimed prior patent and ceased paying royalties to Carstedt who then brought action under the licensing agreement. The trial court rescinded the licensing agreement on the grounds that Carstedt had committed fraud in failing to disclose prior use of the decurler bar at his place of employment for more than one year prior to the patent application, thus creating a public use of the decurler and rendering it unpatentable. We reverse.

Howard Carstedt is a printing press mechanic and general machinist. He was employed at Harrison and Smith Co., a printing company located in Minneapolis, Minnesota, for a period of 19 years, ending in 1978. He started out as a general maintenance man and eventually became a foreman. He had previously had 15 years' experience as a printing press mechanic and was cognizant of problems encountered in the printing industry. One of these problems involved the curling of sheets after the ink had been applied, thus making it difficult to stack the sheets at the end of the run and necessitating the slowdown of the presses.

In 1965, Harrison and Smith had purchased a four color, 38-inch Miehle press. This press had a number of air bars which attempted to keep the sheets flat but were ineffective in preventing the curling of sheets. Carstedt conceived the idea of applying vacuum pressure to the sheets to remedy the curling problem. He obtained a piece of electrical conduit material and manually formed it into his first decurling device. He slit the tube and hammered the two sides down to form curved edges. An air line was attached and connected to a pump which produced a vacuum along the slitted groove between the two hammered, curved portions of the original tube. This device was installed on the Miehle press,

but its installation required the removal of a gas drying bar used in the printing operation.

There is dispute in the record as to the date of this first installation. The maintenance record kept by Harrison and Smith shows that the decurler bar was installed on January 8, 1969, which coincides with Carstedt's recollection of the time of the original installation. Other former employees of Harrison and Smith testified that they thought the installation had been made earlier. The trial court found that the first installation occurred in June of 1967, which is about the time Carstedt commenced employment with Harrison and Smith. However, we attach little significance to this dispute.

After the original installation, Carstedt observed continuing problems with his initial device. He attached an air bar above the device which improved its performance. However, the device could only be used in 20 percent of the press runs because of a variety of problems. Each time the device was to be used, the gas bar had to be removed. The slit provided an uneven vacuum supply and the crudely formed conduit caused problems. The bar itself was not straight, the edges were rough, and Carstedt came to the conclusion that it could not be mounted close enough to the printed material. Nevertheless, Harrison and Smith continued to use this original device from time to time, and when it sold the Miehle press in 1977, the original device was included. Harrison and Smith never paid Carstedt for the use of the original decurler bar, and Carstedt testified that he was not satisfied with its performance and sought ways to improve upon his original idea. He also testified that he would not have been able to develop the device if he had been unable to install it upon a printing press.

Carstedt continued to watch the operation of his original device while at work. He also began experimenting with methods of improving his original concept. The evidence is uncontroverted that in the fall of 1972 he had constructed a new device consisting of two round copper tubes. Holes of even size and spacing were drilled to provide a uniform vacuum to the sheets. The tubes were straight which provided better contact with the sheets. The rounded edges provided a smoother surface. The tubes were then soldered together and provided a lower profile. This permitted a closer installation, and removal of the gas bar was no longer necessary. Vacuum was supplied by a separate pump and installation was simplified. Carstedt attached his two-tube device on a press at Harrison and Smith in the fall of 1972. He removed his newly developed two-tube device sometime in 1973. Carstedt was satisfied that his new device performed in a manner which obviated the problems that occurred in his original single-tube construction.

Gordon Grindeland has been associated with the printing industry since his youth. In 1955, he was employed by Harrison and Smith as a helper and feeder operator. He was familiar with the curling problem in the printing industry. In 1962, he left Harrison and Smith and worked for other printers until commencing his own business in the early 1970's. He had developed a mechanical method of removing "hickey spots" from printing press plates. He obtained a patent on this device with the help of the Dorsey law firm in Minneapolis. He was marketing his device as a sole proprietor under the trade name Clean Print Systems, Inc. In the fall of 1972, he was advised by an employee of Harrison and Smith that Carstedt had developed a decurling device. In November or December of 1972, he contacted Carstedt and invited him to his home to discuss his decurling device. Carstedt and his wife came to Grindeland's home in early January 1973. Carstedt brought with him the full length, two-tube curling device he had assembled and had run tests on in the fall of 1972. The parties are in disagreement as to whether or not there was a discussion of the single-tube prototype device originally developed by Carstedt.

As a result of this meeting, Grindeland arranged for the parties to meet at the Dorsey law firm on February 5, 1973, to consult with Eugene Johnson. Prior to the

meeting, Grindeland prepared a pencil sketch of the two-tube decurler based on information supplied by Carstedt. Carstedt brought with him to Johnson's office a model of his two-tube decurler. Carstedt testified that he had never been involved in a patent application prior to the February 5, 1973, meeting. Understandably, Johnson testified that he could not clearly recall the discussions at the meeting. He received the sketch prepared by Grindeland, made further notes thereon, and had the document executed by Carstedt and witnessed by himself and Grindeland. Johnson acknowledged that Carstedt had brought with him a model of a two-tube decurler. He further testified that he knew Carstedt had never been involved in a patent application. Johnson testified that it was his practice to make inquiry as to prior use of the invention and he had followed this practice on February 5. He stated that it was his impression that the device had been in use about two months. Johnson testified that he thought his question as to previous use of the decurler (the two-tube model) included use of earlier models. He denied that there had been any discussion about a single-tube decurler. Carstedt testified that he told Johnson about a prototype that he had been experimenting with and that it had been on a press. He further testified that Johnson indicated this would not be a problem and did not go into detail about this earlier installation. Grindeland testified that he recalled Johnson asking Carstedt how long the device had been in use and telling Carstedt that he could not get a patent if the device had been in use for more than one year. Grindeland also testified that he could not recall for certain what Carstedt said to Johnson regarding use. He further stated that Carstedt may have mentioned something about experimenting and that he had used it or tried it, but no length of time was stated. Grindeland testified that it was his impression that the device had been in use for less than a year. Johnson testified that he did not explain in detail to Carstedt what was involved in public use for over one year nor did he ask Carstedt about prior models that might have been used for more than a year. Johnson stated that he relied a great deal upon the representations made to him by Grindeland in preparing the patent application, more so than representations by Carstedt. He stated: "Well, now Carstedt really didn't make many representations. He was very quiet, in my opinion.

As a result of this meeting, Johnson had a patent search conducted to determine if a patent could be obtained on the decurler. Based on initial searches, Johnson advised that a reasonably broad patent could be obtained. Subsequent events disclosed that the patent office had misfiled an earlier patent (the Monks patent) which was very similar to Carstedt's invention. On March 27, 1973, Carstedt and Grindeland again met with Johnson regarding the patent application. Carstedt brought pictures he had taken at Harrison and Smith's plant showing the two-tube decurler he had temporarily installed there. Also, at this meeting the use of the air bar was discussed and included in the description of the device. Johnson continued to work on the patent until 1974, when he withdrew and advised Carstedt to obtain separate counsel since Grindeland was seeking to purchase Carstedt's interest. Carstedt's new counsel continued the patent work and was on the verge of receiving the patent when Grindeland received a letter dated February 11, 1975, from Baldwin-Gegenheimer claiming preexisting decurler rights under the Monks patent. Thereafter, on August 18, 1975, Johnson, on behalf of Grindeland, sent a letter to Carstedt's counsel regarding a licensing agreement between Carstedt and Grindeland. Grindeland ceased paying royalties to Carstedt but has continued in the business of manufacturing and selling decurling devices. The business is profitable and Grindeland has made manufacturing and material changes in the original design which have made the product more saleable.

In March of 1973, Grindeland arranged for the Dorsey firm to prepare a licensing agreement between himself and Carstedt. The original agreement was executed on June 9, 1973, and amended on August 20,

1973, to provide for a reduction of royalties from 15 percent to 10 percent. Carstedt did not obtain independent counsel to review the agreement. The agreement specifically provides that Carstedt was not making any representations to Grindeland as to the scope or validity of any patent or patent applications licensed under the agreement. Carstedt further specifically did not warrant that the decurler would not infringe other patents. The agreement further provided that if no patents were to issue, the agreement would continue with respect to manufacturing and sales rights in the United States for a period of 15 years.

Carstedt, through the efforts of his second counsel, did obtain a patent to a decurler which included an air bar. Grindeland contends that his present operation is not in violation of this patent. Grindeland claims he would not have executed the exclusive licensing and patent agreement in 1973 if he had been aware of the alleged prior public use since he could have manufactured the device free of any claims by Carstedt. The trial court found that there had been a prior public use for more than one year instead of experimental work on the device. The evidence in this record would not support such a finding, but our disposition of this case obviates the necessity of any detailed consideration of this evidence.

The trial court found that Grindeland had been fraudulently induced into entering the licensing agreement, that the contract was rescinded, but allowed Carstedt to recover royalties up to August 20, 1975, the date Carstedt received notice of termination from Grindeland. The trial court also found that the contract was not unenforceable because of mutual mistake of fact and denied Grindeland's counterclaim for repayment of royalties made to Carstedt. Grindeland has a notice of review as to the effective date of the rescission.

The issues presented are:

1. Was Grindeland induced to execute the licensing agreement based on fraudulent misrepresentations by Carstedt?

2. If the contract was not fraudulently procured, is it unenforceable because of mutual mistake?

3. If the contract is rescinded or unenforceable, what is the proper remedy?

1. The trial court found that Grindeland had been fraudulently induced to enter the licensing agreement based on Carstedt's failure to disclose prior public use of his decurling device. At oral argument the parties both agreed that if there was a fraudulent representation, it could have occurred only at the February 5, 1973, meeting at Johnson's office. In reviewing the events of that day, this court will not set aside findings of fact by the trial court unless they are clearly erroneous. Minn.R. Civ.P. 52.01. Findings of fact can be held to be clearly erroneous only if, based on the entire evidence, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Roy Matson Truck Lines, Inc. v. Michelin Tire Corp.*, 277 N.W.2d 361 (Minn.1979). This court will not set aside findings when there is evidence which reasonably supports the same. *See Peterson v. Johnston*, 254 N.W.2d 360 (Minn.1977). These rules provide a framework which normally results in the affirmance of the facts found by a trial court. However, there are certain practical limitations which are not often enunciated, but are considered. One of these factors is that the trial judge generally must rely on his memory and notes regarding the evidence presented. Sometimes, as in this case, partial transcripts are available. However, when the entire record is prepared for review by this court and the appellate advocates, after examining the record, agree that the evidence of one particular meeting is determinative of the primary issue on appeal, the appellate court is in a better position to scrutinize the emphasized evidence. The trial court did have the advantage of observing the demeanor of the witnesses, but where credibility is not really the key dispute, then the position of the appellate court in reviewing the transcribed evidence remains advantageous.

In examining the evidence, the knowledge and experience of the participants are

necessary ingredients. In this case, Johnson is an experienced patent attorney. He routinely deals with the complex field of patent law. Grindeland was a businessman who was involved in another patent proceeding and thus had exposure to the field. Carstedt was a machinist with absolutely no exposure to patents or the business world. Thus, when the parties met in Johnson's office on February 5, 1973, there was a great disparity of knowledge of patent law among them. Carstedt had presented to Grindeland the two-tube decurler he had recently designed and tried out. Grindeland had prepared a drawing of a two-tube decurler which he presented to Johnson. Johnson testified that although he could not recall the specific conversation, he always inquired as to prior use. He further testified that there had been no discussion of a single-tube decurler. However, Carstedt and Grindeland both testified there had been some discussion regarding a prior model. Johnson said that when he asked Carstedt about prior use, he intended his general question to include prior models. Johnson did agree that he could have been more specific. The evidence is clear that Carstedt indicated that the prior use was about two months. From this, the trial court concluded he had fraudulently withheld information about his prior model. This conclusion cannot be justified or sustained.

■ In *Davis v. Re-Trac Manufacturing Corp.*, 276 Minn. 116, 117, 149 N.W.2d 37, 38–39 (1967), this court set out the elements for fraud which include:

1. There must be a representation;
2. That representation must be false;
   *   *   *   *   *   *
6. The represener must know it to be false, or in the alternative, must assert it as of his own knowledge, without knowing whether it is true or false;
   *   *   *   *   *   *

In this case, there was a representation but it was not known to be false. There is a distinction between fact, which is objective, and truth, which is subjective. If we give the best inference to the evidence in favor of Grindeland, we can assume that factually the decurler had been in existence for more than one year. However, we do not need to reach the issue of whether this prior use was experimental or not. We are satisfied that when Carstedt responded to the question regarding public use, he told the truth. We reach this conclusion because all of the evidence supports the view that Carstedt was talking about his two-tube decurling device. This was the device he had brought to Grindeland. This was the device sketched in the drawing. This was the device before the parties at the time of the critical question and answer. This device had been in use only for two months. If we are to ascribe falsity to Carstedt's statement, we would have to imply that he knew or should have known the importance of one year's public use of his decurling device. There is absolutely nothing in the record which would support such an interpretation. Johnson's question was in general terms to a person who had never had any exposure to a patent matter. Johnson testified he knew that Carstedt had no knowledge of patent law. Thus, while Johnson may have intended his general question to include uses of prior models, there is no basis to infer that Carstedt should have so understood it. The fact that Carstedt had no understanding of the importance of this issue is not determined by any single piece of evidence. However, the totality of the circumstances existing at the meeting leads to no other conclusion. Thus, we conclude that the trial court's finding that Carstedt fraudulently concealed an alleged prior public use of his decurling device is clearly erroneous.

■ 2. Having concluded that the agreement cannot be rescinded based on fraud, we must then consider whether it is unenforceable because of mutual mistake. Grindeland contends that mutual mistake occurred because the Monks patent precluded the issuance of a patent. The trial court found there was no mutual mistake on the grounds that the parties had assumed the

risk that no patent would issue. We agree. In this case, there was no certainty that a patent could be obtained. Moreover, the parties specifically provided in their agreement that license fees would be payable for 15 years in the absence of a patent. Thus, in the absence of Carstedt's fraud, license fees would have been payable without the issuance of a patent. *See Beattie v. Product Design & Engineering, Inc.*, 293 Minn. 139, 198 N.W.2d 139 (1972). There was no mutual mistake in this case that would justify a rescission.

Grindeland also argues that the agreement should be declared void as its inception because of a failure of consideration, since what he bargained for was the exclusive right to make the decurler. The agreement contemplated the payment of license fees even if a patent never issued. Therefore, the parties contemplated that some consideration other than the obtaining of a patent was to be given. This consideration was in the form of know-how and technical assistance furnished by Carstedt which is valid consideration for a contract.

3. Having concluded that the contract is valid, we need not discuss rescission.

The judgment of the trial court is vacated and the matter is remanded to the trial court for entry of judgment consistent with this opinion.

SHERAN, C. J., and SCOTT, J., took no part in the consideration or decision of this case.