PARK–LAKE CAR WASH, INC., Respondent (C4–86–127, C4–86–144), Appellant (C6–86–128),

v.

Arthur J. SPRINGER, Defendant,

and

(Carl V. Springer, Personal Representative of the Estate of Arthur J. Springer, deceased and Richard Springer, Special Personal Representative of the Estate of Arthur J. Springer, deceased), Substituted Defendants and Third Party Plaintiffs, Appellants (C4–86–127), Respondents (C6–86–128, C4–86–144),

v.

Jack CHRISTY, et al., Third Party Defendants, Respondents,

and

Propper Oil Company, Intervenor, Respondent (C4–86–127, C6–86–128), Appellant (C4–86–144).

Nos. C4–86–127, C6–86–128 and C4–86–144.

Court of Appeals of Minnesota.

Sept. 30, 1986.

**506**

Connor F. Schmid, Minneapolis, for Carl V. Springer.

Josiah E. Brill, Jr., Minneapolis, for Park-Lake Car Wash.

Robert Bennett, Thomas M. Jenkins, Minneapolis, for Jack Christy.

Thomas F. Miller, Minneapolis, for Propper Oil Co.

Heard, considered and decided by FOLEY, P.J., and HUSPENI and CRIPPEN, JJ.

## OPINION

FOLEY, Judge.

The matter before this court stems from a complicated and tortured procedural history. In September 1980, Park-Lake Car Wash, Inc. (Park-Lake) sued Arthur J. Springer for specific performance of an agreement involving sale of the car wash property. During pendency of the action, Arthur Springer died and representatives of the Springer estate entered into a purported indemnification agreement and contract for deed to deliver fully warrantable and marketable title to Jack and Bonneigh Christy.[1] In exchange, the Christys were to pay Springer the purchase price of the property under the terms of the contract for deed as well as payment for defense of the action instituted by Park-Lake. Both sides moved for summary judgment. The trial court granted summary judgment in favor of Springer and Park-Lake appealed. The supreme court in *Park-Lake Car Wash, Inc. v. Springer*, 352 N.W.2d 409 (Minn.1984), reversed the summary judgment, holding that Park-Lake was entitled to specific performance under its right of first refusal and remanded the case "for determination of other issues raised and not decided below." *Id.* at 413.

On remand, Park-Lake was granted possession of the property. Following trial, the court found that Park-Lake had failed to sustain its burden of proof in its claim against Springer for loss of use and restoration damages; that even if this burden had been met, damages were more than offset by improvements made to the property before it was returned to Park-Lake; that the indemnification agreement between Springer and the Christys was unenforceable due to independent grounds of mutual mistake of fact and failure of consideration; and that as a direct result of this cancellation of the agreement, the Christys were entitled to refund by Springer of all monies paid under the contract and expended pursuant to the agreement. The trial court further dismissed with prejudice intervenor Propper Oil's claim for reimbursement of amounts expended in improving the car wash. Judgment was entered. Appeals were taken from this judgment and from a subsequent order denying motions by appellants Park-Lake, Springer and Propper Oil for a new trial. These appeals were consolidated pursuant to a motion by the Christys. We affirm.

## FACTS [2]

In 1953, Park-Lake, formerly Automatic Car Wash, Inc., entered into a 10–year lease with Arthur Springer for the western portion of the commercial property he owned in south Minneapolis. The lease, which contained a right of first refusal and two successive 10–year options, was due to expire on June 30, 1983. Pursuant to the terms of the lease, Park-Lake's predecessor built a car wash on the property at its own cost. Park-Lake discontinued its use of the property as a car wash in March 1979 after sustaining extensive operating losses, but

---

1. Hereinafter, all references to Arthur Springer will use his full name; all references to Springer's estate will be called "Springer".

2. For a more detailed review of the facts leading up to the Minnesota Supreme Court's decision, see *Park-Lake Car Wash, Inc. v. Springer*, 352 N.W.2d 409 (Minn.1984).

continued to pay rent until expiration of the lease in June 1983.

In July 1980, Arthur Springer received an offer from the Christys to purchase the western half of the property containing the car wash. Upon notification of the Christy offer, Park-Lake informed Arthur Springer that it was exercising its right of first refusal contained within the lease and would purchase the property for $85,000 cash, the same purchase price contained within the Christy offer. Shortly thereafter, Park-Lake notified Arthur Springer by letter on August 4 that it was exercising its right-of-first-refusal and enclosed a bank money order for 10% of the purchase price. The letter also provided, pursuant to the lease, that Park-Lake anticipated closing within 45 days and would remit the balance due at that time.

When informed that it was required to match the extended payment terms outlined in the Christy offer, Park-Lake sent a second letter on August 6 to Arthur Springer, amending the first and stating that it would exercise its right-of-first-refusal by accepting all the terms proposed in the Christys' purchase agreement and contract for deed.

Several discussions subsequently took place between the parties' attorneys concerning the terms of the purchase agreement and, in particular, the payment of an additional amount equal to the real estate taxes through the end of the lease. This latter payment was designed as a benefit to Arthur Springer personally. Park-Lake refused Arthur Springer's demand for a modified contract that would continue to hold it responsible for real estate taxes, in addition to the extra payment. Closing on the sale to the Christys was to take place in October 1980. In September 1980, Park-Lake sued Arthur Springer for specific performance of the original purchase agreement.

Arthur Springer died in February 1981, while the case was pending. Later that year, when informed of Park-Lake's attempts to negotiate with Springer, the Christys renewed their previous stated intent to sue Springer should it convey the property to Park-Lake or refuse to sell the property to them. With the exception of intervenor Propper Oil, the parties had a history of controversies and were aware that continued litigation over the subject property was likely. In January 1982, an indemnification agreement was executed between the Christys and Springer.

According to the Christys, in consideration for conveyance of warrantable and marketable title to the property, they agreed to indemnify Springer against all current and future claims related to the transaction, including, but not limited to, all attorney's fees, litigation costs and damages. The agreement also provided for all future defense representation related to the district court action and, in the event the Christys did not provide adequate representation as determined by Springer, immediate reimbursement for all costs and expenses incurred in any such defense. A contract for deed was executed with the Christys' attendant right to collect rent and take full physical possession of the property at the expiration of the lease. The Christys provided a $23,500 down payment and made monthly payments of $750 on the contract for deed. Pursuant to this agreement, the Christys' provided counsel for Springer to continue the litigation in district court. In February 1983, the trial court determined that no contract arose between Park-Lake and Arthur Springer since Park-Lake's August 4 letter constituted a counter offer, terminating Park-Lake's right of first refusal and, accordingly, making its August 6 letter inoperative as an acceptance. Summary judgment was granted to Springer, and Park-Lake appealed to the Minnesota Supreme Court.

During pendency of the appeal, in June 1983, Park-Lake's lease on the subject property expired and the Christys assumed control. The property was left vacant, however, until March 1984, when the Christys entered into a long-term lease with Propper Oil. The lease specifically provided that the Christys would not be held liable to Propper Oil should they lose

possession of the property as the result of a reversal by the supreme court. On March 22, 1984, Park-Lake's attorney advised attorneys for the Christys and Springer that Propper Oil was proceeding at its own risk in making improvements to the property should Park-Lake prevail on appeal. On March 28 a similar letter was sent to Propper Oil. Propper Oil proceeded to make substantial improvements on the property, altering the building to accommodate a retail auto parts facility under the name 10,000 Auto Parts. Total cost of the improvements was $103,206.68.

On August 3, 1984, the supreme court reversed the lower court's decision and held that Park-Lake was entitled to specific performance of the modified agreement (the August 6 letter) under its right of first refusal. The case was remanded for a determination of damages and other claims "raised and not decided below." See Park-Lake, 352 N.W.2d at 413. Accordingly, the decision terminated the Christys' interest in the property and nullified their lease with Propper Oil.

Following the supreme court's decision, Park-Lake moved for an order directing Springer to execute the contract for deed on the property and enter judgment on its various damage claims. When the Christys demanded reimbursement from Springer for litigation fees, Springer joined them as a third-party defendant. A subsequent motion by the Christys to intervene as defendants in order to recover the value of improvements on the property was denied. In March 1985, pending trial on the merits and pursuant to stipulation of the parties, the trial court transferred possession of the premises to Park-Lake, to be effective as of March 1, 1985. Propper Oil intervened, asserting a claim against Park-Lake for the value of improvements made to the property.

The matter proceeded to trial in June 1985. Claims asserted at trial included:

*Park-Lake v. Springer:* (a) loss of use of the property from October 1, 1980 to February 28, 1985; (b) rent and taxes paid pursuant to the lease from October 1, 1980 to June 30, 1983; (c) delinquent real estate taxes from June 30, 1983 to March 1, 1985; and (d) cost of restoring the property to the condition at the time of sale (October 1980).

*Springer v. Park-Lake*: any damages recovered by Park-Lake should be offset by (a) the $15,000 cash payment due at closing; (b) all $750 per month payments which would have been due under the contract for deed from November 1, 1980 to October 1, 1985; and (c) an amount equal to real estate taxes for 1981. Springer and the Christys additionally argued that any damages recovered by Park-Lake should also include an offset for the increase in value due to improvements made to the property.

*Propper Oil v. Park-Lake:* for the value of improvements made to the property.

*Springer v. Christys (Third-Party action):* to enforce the indemnity agreement.

*Christys v. Springer:* to cancel, rescind or reform the indemnification agreement for failure of consideration, misrepresentation, mutual mistake of fact and of law, and estoppel for misconduct on the part of Springer and its attorney.

At trial, Henry Reget, owner of Park-Lake, testified that he had intended to convert the subject property into a coin-operated laundromat in October 1980. Reget had previously owned two such laundromats up until 1958 but had not been in the business since that time. He stated that the building, as it existed in October 1980, could have accommodated the venture but acknowledged that it would have been necessary to repair a number of items and renovate the front part of the building. He further acknowledged that his intent to convert the property into a laundromat was unsupported by any written documentation, market or demographic analysis. Additionally, conversations with business associates he claimed to have about his plans were unsubstantiated.

The evidence further established that in the period Park-Lake ceased operation as a car wash in March 1979 to May 1983, when the Christys assumed possession, the property had fallen into disrepair, primarily due

to vandalism. Todd Reget, manager of Park-Lake since 1980, acknowledged that vagrants continued to frequent the building after Park-Lake removed its equipment in the fall of 1982 despite routine checks on the property. When the Christys assumed possession of the property, they replaced the boarded-up windows and doors with glass and put on new locks. Jack Christy testified that after these replacements were made, the type of vandalism that had previously occurred stopped. The evidence further provided that the Christys were unable to lease the building until March 1984, although they relied solely on word of mouth to advertise for new tenants since they live most of the year in Florida.

In reference to Park-Lake's claim for restoration damages, Glenn Burnett, a civil engineer and professional estimator, submitted a report which listed a total restoration cost of $20,168. His testimony based on this report was uncontradicted.

Four certified appraisers testified regarding Park-Lake's claim for lost use of the property from October 1, 1980 to February 28, 1985. A synopsis of their testimony is illustrated below:

| | Total Fair Rental Value (10/1/80–2/28/85) |
|---|---|
| (1) Culver La Salle (for Park-Lake) | $55,125 |
| (2) Russell Smith (for Park-Lake) | $53,000 |
| (3) Louis Frillman (for Springer) | $32,452.50 |
| (4) Lyle Nagell (for Propper Oil) | $103,500 (correlated value before improvements) |
| | $176,000 (correlated value with improvements at present use). |

LaSalle's appraisal incorporated such factors as the high commercial value of a Lake Street location, the commercial improvements in the Hennepin-Lake district which favorably affected rental values as of 1982/83, and five nearby comparison properties. Smith's appraisal was based in part on 12 comparison properties. He stated that off-street parking provided by the subject property was an important factor increasing its value. Frillman stated that his appraisal did not include any increase in rental value throughout the five-year period at issue since he believed that modifications were necessary in October 1980 before the building could be marketable as rental property. On cross-examination, Frillman acknowledged that comparable properties he used were "not good" because it was difficult to retroactively determine rental value.

LaSalle, Smith and Frillman agreed that impending litigation would adversely affect the value of the property since it would be more difficult to attract tenants or buyers. Smith, however, did not include the litigation factor in his appraisal. LaSalle and Smith also testified that the improvements made by Propper Oil, which would benefit the coin-operated laundry, were $26,100 and $31,000 respectively.

Emil Walsh, a commercial contractor, testified that based upon his inspection of the subject property in February 1982, the building would not be readily usable as either a coin-operated laundry or a commercial retail outlet unless the floor, windows and doors were replaced and the plumbing and exterior was repaired. Walsh agreed, however, that the structure of the building was basically sound.

Nagell arrived at his appraisal by using cost, income and market methods of valuation. These figures were combined to arrive at a correlated value. Of the four

appraisers, only Nagell compared the value of the subject property before and after Propper Oil's improvements. His figures reflected a net increase in value of $72,500.

The evidence further established that Park-Lake paid total rent of $13,500 and total real estate taxes of $16,105 on the subject property and adjoining property between October 1, 1980 and June 30, 1983, plus $11,034.31 in delinquent taxes from 1983 through the first half of 1985.

With regard to the third-party action to enforce the indemnity agreement, the drafter of the agreement and current counsel for Springer, Connor Schmid, testified that the Christys were to assume responsibility for all damages and expenses resulting from their exercise of possession of the property. Schmid explained that he had initially proposed the indemnification arrangement to Arthur Springer after he had expressed interest in a testamentary transfer of the property to the Christys during an October 9, 1979 meeting. The Christys testified that at the time, they believed Schmid was acting as their attorney as well and that they entered into the agreement with the understanding that Park-Lake's claims were groundless. Schmid denied that he functioned as attorney for both parties to the agreement.

The parties stipulated that under the indemnification agreement, the Christys paid $17,513.91 in legal expenses to Harstad & Rainbow, the law firm originally hired to represent Springer and that an outstanding balance of $3,349.51 remained.

After considering all of the evidence submitted, the trial court issued findings of fact, conclusions of law and order for judgment. This appeal followed denial of subsequent post-trial motions by Park-Lake, Springer and Propper Oil.

## ISSUES

1. Did Park-Lake prove by a fair preponderance of the evidence that it was entitled to damages for lost use of the property and cost of restoring the property to its former condition?

2. Did the trial court err in determining that Springer was entitled to offset the value of improvements made by its successor in interest against Park-Lake's damages for Springer's wrongful possession of the property?

3. Does the evidence support the trial court's finding that the value of improvements more than offset damages Park-Lake claimed to have arisen during the period of erroneous possession?

4. Did the trial court err in determining that the amount of interest payable by Park-Lake for retroactive reinstatement of its contract for deed agreement should be the same rate the Christys had paid for their offer instead of the statutory rate?

5. Did the trial court err in rescinding the indemnification agreement between Springer and the Christys on grounds of failure of consideration and mutual mistake of law and fact?

6. Is Springer's claim that the Christys should be estopped from cancelling the indemnity agreement on grounds of promissory estoppel reviewable by this court?

7. Did the trial court err in ordering Springer to return monies paid by the Christys pursuant to the purported indemnification agreement?

8. Did the trial court err in determining that Propper Oil was not entitled to credit for its improvements based on unjust enrichment?

## ANALYSIS

### I.

■ The purpose of specific performance is to put the parties in the position they would have been in had the contract been performed. *See Fred O. Watson Co. v. U.S. Life Insurance Co.*, 258 N.W.2d 776 (Minn.1977). In implementing specific performance, a court may grant relief on terms that will work complete justice between the parties. *Bakke v. Keller*, 220 Minn. 383, 399, 19 N.W.2d 803, 811 (1945). In the instant case, specific performance requires that the parties be placed in the

same position they would have occupied had the sale been completed in October 1980.

A plaintiff has the burden of proving damages by a fair preponderance of the evidence. *Pagett v. Northern Electric Supply Co.*, 283 Minn. 228, 236, 167 N.W.2d 58, 64 (1969). Park-Lake argued, and the trial court agreed, that the determination of damages is more closely akin to an accounting than an assessment of damages. *See Indianhead Truck Line, Inc. v. Hvidsten Transport, Inc.*, 268 Minn. 176, 193, 128 N.W.2d 334, 346 (1964) (quoting Annot., 7 A.L.R.2d 1204, 1206 (1949)). In other words, the court "in order to relate the performance back to [the date fixed for completion], equalizes any losses occasioned by the delay by offsetting them with money payments." *Id.*

### Loss of Use Damages

█ Park-Lake contends that the testimony of appraisers Smith and LaSalle amply demonstrated that the property would have produced a fair rental value of $1000 per month from October 1, 1980 to February 28, 1985. In addition, Park-Lake argues that since this figure represents an average *net* monthly rent, (requiring the tenant to pay all expenses, including real estate taxes), it is also entitled to reimbursement of $19,164 in real estate taxes paid from October 1, 1980 to the first part of 1985. In essence, Park-Lake claims that since it was clearly denied rightful ownership of the property, the only remaining question was the value of its loss of possession. This oversimplifies the issue.

The trial court's findings reflect that Park-Lake failed to demonstrate an ability to sublease the property from March 1979 to June 1983.

9. Plaintiff discontinued its use of the subject property as a car wash in March of 1979 and did not sublease the property for the over four years remaining on its lease, except for the occasional rental of the property to Paul Williams for the monthly sum of $100, * * *.

10. After March of 1979 and through termination of its lease on June 30, 1983,

plaintiff viewed the property as a losing proposition and allowed it to deteriorate; vandals destroyed portions of the subject property, vagrants lived on the subject property, and plaintiff spent little, if any, money on maintenance or repair of the building, * * *.

These findings are further explained in the trial court's memorandum:

Plaintiff claims damages for lost use of the property from October 1, 1980, to February 28, 1985. Appraisers Smith, LaSalle and Frillman all testified that the existence of litigation over ownership of the property would affect its tenantability. Litigation would have occurred regardless who, if anyone, purchased the property. Park-Lake either did not or could not rent the property during its tenancy, except occasionally for short periods and for a nominal sum. Christys could not find a tenant for nearly two years after purchasing it.

Park-Lake's additional claim for reimbursement of monies expended to pay real estate taxes is related to its burden of proving loss of use damages. In particular, Park-Lake contends that it is entitled to $16,105 paid under the terms of the lease from October 1, 1980 to June 30, 1983 (of this amount, approximately $6,454 was earmarked for adjoining property, leaving a balance paid on the subject property of $9,651) and to $11,034 in delinquent taxes on the subject property from July 1983 to February 1985. The trial court determined that Park-Lake was entitled to credit for $6,454, the adjoining property tax, but was not entitled to reimbursement of any taxes paid on the subject property from October 1980 to February 1985. It follows that if Park-Lake failed to demonstrate an ability to rent the premises from October 1980 to June 1983, it would have remained responsible for real estate taxes of $9,651. The delinquent tax amount paid by Park-Lake is guided by the same principles. If the property was intended to be converted into a laundromat, Park-Lake would have remained responsible for real estate taxes

after July 1983. Park-Lake cannot have it both ways.

*Restoration Costs*

■ Park-Lake claims that since evidence of restoration costs totaling $20,168 was uncontested at trial, it is entitled to damages in this amount. While it is true that Park-Lake's expert witness, Glenn Barnett, was the only expert to supply a precise figure for restoring the building to its condition as of October 1980, we agree with the trial court's analysis and view the issue of restoration damages as interrelated with Reget's claim that he intended to convert the property into a laundromat.

Plaintiff also claims damages in the sum of approximately $20,000, necessary to restore the property to its condition prior to Christys' tenure. These changes include replacing the 9 feet removed from the rear of the building, unblocking windows, and replacing the front canopy. Plaintiff's argument is based on Henry Reget's contention that he intended to renovate the property and use it as a coin-operated laundromat. Plaintiff offered little evidence of this intent. Reget testified he had purchased one washing machine from which the coin-op mechanism was removed. That machine is in use at Park-Lake Car Wash. Plaintiff has done no demographic studies or market analyses, nor have plans for the proposed business been done. The only other evidence offered by Reget in support of the contention, was verbal testimony that he had discussed the proposal with Bentley Smith and Jay Warmington and Reget himself formerly operated a coin-op laundry. The discussions were unsubstantiated at trial.

Park-Lake contends that even if Reget's testimony was "unsubstantiated," it cannot be wholly disregarded by the trial court, especially since the testimony was uncontradicted. A trial court has broad discretion in assessing the credibility of witnesses and the weight to be given their testimony. *Georgoplis v. George*, 237 Minn. 176, 182, 54 N.W.2d 137, 141 (1952). Similarly, the trier of fact is not compelled to believe a witness simply because his or her testimony is uncontroverted. *Costello v. Johnson*, 265 Minn. 204, 211, 121 N.W.2d 70, 76 (1963). We will not second guess the trial court's evaluation of the testimony.

## II.

Even if Park-Lake had met its burden of proof, it does not necessarily follow that it was entitled to the dollar amount proved as damages. Since Park-Lake confines this argument to the offset allowed Springer and the Christys for the value of improvements to the property on the theory of unjust enrichment, we will similarly confine our analysis.

■ Unjust enrichment need not be based on fraud or mistake; such a remedy may also be based on "situations where it would be morally wrong for one party to enrich himself at the expense of another." *Anderson v. DeLisle*, 352 N.W.2d 794, 796 (Minn.Ct.App.1984). Stated another way, unjust enrichment may be found where a plaintiff's conduct "has been unconscionable by reason of a bad motive, or where the result induced by his conduct will be unconscionable either in the benefit to himself or the injury to others." *Earle R. Hanson & Associates v. Farmers Cooperative Creamery Co.*, 403 F.2d 65, 70 (8th Cir. 1968) (quoting *Johnson v. Freberg*, 178 Minn. 594, 597–98, 228 N.W. 159, 160 (1929)).

■ Minnesota courts have long recognized that parties under a contractual relationship who make improvements to property are entitled to offset the value of those improvements against damages claimed by the rightful owner. *See Abrahamson v. Lamberson*, 79 Minn. 135, 81 N.W. 768 (1900) (assignee/vendor has right to credit for his permanent improvements against vendee's damages based on wrongful withholding of possession); *see also Tompkins v. Sandeen*, 243 Minn. 256, 67 N.W.2d 405 (1954) (in action for specific performance where contract found unenforceable, purchaser entitled to value of improvements made in reliance on the con-

tract and vendor entitled to offset reasonable value of use and occupation of premises from this sum).

■ The trial court rejected Park-Lake's claim that Springer and the Christys would receive a windfall if allowed credit for Propper Oil's improvements, stating:

Christys had a duty to mitigate damages by finding a tenant, and to do the economically reasonable thing. *Lanesboro Produce and Hatchery Co. v. Forthun*, 218 Minn. 377, 16 N.W.2d 326 (1944). It would not have been economically reasonable for Christys to leave the property empty during the pendency of the litigation. The lease which was executed by Propper and Christys specified rent in the sum of $1000 a month. Christys would not receive a windfall from an offset of the increase in value to the property. Christys found a lessee for the property and mitigated damages pending the outcome of the litigation.

We agree. If a "windfall" were to result, it would not stem from allowing an offset for improvements, but rather from allowing Park-Lake to suceed to ownership of property greatly enhanced in value when it did little to enhance the value of the property itself. As stated in the trial court's memorandum:

It would be inequitable for plaintiff to take the property without an offset for the improvements done therein. The property is at present being used as retail property after over $100,000 was expended to make it tenantable. Prior to Christys' ownership, the building was left empty, plaintiff having closed the car wash business. The premises had been damaged by vandals, occupied by vagrants and was left with little or no heat in winter. Although plaintiff's conduct was arguably in violation of the lease with Springer, it did not constitute fraud or illegality.

Relying on *Marr v. Bradley*, 239 Minn. 503, 59 N.W.2d 331 (1953), Park-Lake additionally argues that since Propper Oil's improvements were made with full knowledge of its lawsuit for specific performance, it would be inequitable to allow Springer and the Christys offset for improvements. In that case, Marr executed an agreement to purchase property owned by the Sheffs. Two weeks later, the Sheffs executed a second agreement for purchase of the property with the Bradleys. When Marr learned that the Sheffs did not intend to consummate their agreement, he commenced an action for specific performance. The deed to the property was subsequently transferred to the Bradleys, who made substantial improvements on the premises. The trial court found for Marr and the supreme court affirmed. Addressing the Bradley's claim that it would be inequitable to compel conveyance of the property in light of their substantial improvements, the supreme court stated:

There are two answers to this contention. In the first place, they made such improvements after they had constructive notice of plaintiff's claims and did so, at least as far as their legal rights are concerned, taking the chance that plaintiff might be determined to have rights superior to theirs, and secondly, *the court undoubtedly can adjust such rights in an action for an accounting between the parties, part of the premises having been rented during the pendency of the action.*

*Id.* at 511, 59 N.W.2d at 335 (emphasis supplied.)

■ It is apparent from this emphasized language, that substantial improvements to property will not prevent the application of specific performance, but instead will be considered in an accounting between the parties to a contract. This was clearly the position of the trial court in this case.

### III.

■ Park-Lake asserts that if Springer is entitled to offset the improvements made by Propper Oil, the offset should be limited to improvements which benefit the intended use of the building, not the increased

rental value of $72,000.[3] This argument once again is intertwined with evidence of intended use. The trial court found that damages were not proven by a preponderance of the evidence, a finding that we have determined is not clearly erroneous. As such, appraisers Smith and LaSalle's testimony that the improvements resulted in a net enhancement (for use as a laundromat) of $31,000 and $26,100 respectively is, for the most part, irrelevant.

Since Park-Lake does not dispute that Propper Oil's improvements increased the value of the property by $72,000, (see footnote 3), the next question to be addressed is the net rental value of the property in its prior form. Park-Lake's appraisers estimated that the total net monthly rent from October 1, 1980 to February 28, 1985 was $55,125 (LaSalle) and $53,000 (Smith). Springer's expert appraised the total net monthly rent for this period at $32,500 (Frillman).

It is evident that regardless of what appraisal was relied upon by the trial court, the amount was more than offset by the increase in the fair market value of the property during the Christys' possession of the property. To deny Park-Lake recovery for loss of use damages based on this evidence was not clearly erroneous.

### IV.

■ Park-Lake argues the trial court erroneously determined that it was required to pay 10% interest on payments owed under the contract while allowing the Christys refund of monies paid at interest determined by the statutory rate. We are not similarly persuaded. As the trial court stated in its post-trial memorandum:

> [In] order to put the parties in the same position they would be in had the contract been performed, *Watson v. U.S. Life Ins. Co.*, 258 N.W.2d 776 (1977), the

requirement for implementing specific performance, the Court must enforce the contract as to [Park-Lake] and [Springer] and rescind the contract as to [Springer] and Christys.

The terms of sale specifically provide for an annual interest rate of 10%. As explained in *Watson:*

> The compensation awarded as incident to a decree for specific performance is not for breach of contract and is therefore not legal damages. * * * The situation is simply that, if the court orders it to be performed, the decree must as nearly as possible order it to be performed *according to its terms*, and one of those terms is the date fixed by it for its completion. This date having passed, the court, in order to relate the performance back to it, equalizes any losses occasioned by the delay by offsetting them with money payments.

*Id.* at 778 (quoting *Indianhead Truck Line*, 268 Minn. at 193, 128 N.W.2d at 346) (emphasis supplied).

### V.

*Consideration*

Equity may cancel or rescind an agreement for failure of consideration. *Hatcher v. Union Trust Company of Maryland*, 174 Minn. 241, 246, 219 N.W. 76, 78 (1928). Consideration can take the form of either a benefit to the promisee or detriment to the promisor. *Estrada v. Hanson*, 215 Minn. 353, 355, 10 N.W.2d 223, 225 (1943).

The January 7, 1982 indemnity agreement at issue between Springer and the Christys provided in relevant part:

> WHEREAS, Representative has been made a defendant in an action (Hennepin County District Court No. 771127) by Park-Lake Car Wash, Inc. to compel transfer by Park-Lake of certain proper-

---

**3.** Nagell, the appraiser relied on by the trial court, acknowledged that he calculated rental value of the building as it existed in October 1980, based on 3900 square feet, the size of the building *after* Propper Oil's improvements. The proper square footage of the building in October 1980 was 4200 square feet. Nagell agreed that this would lower the difference between total net rental value by $8,000 to $9,000. Since Park-Lake does not dispute $72,500 as reflective of the increase in net rental value of the property, it will be used as a basis for offset throughout this analysis.

ty described in a Purchase Agreement between Arthur Springer and Christys dated July 9, 1980, as follows:

West ½ of Lots 1, 2 and 3, Motor Line Addition to Minneapolis, Hennepin County, Minnesota.

WHEREAS, it appears to Christys that Park-Lake has waived its lessee's privilege to purchase said property by failing and refusing to match the terms of the said Christys' offer set forth in said Purchase Agreement, and

WHEREAS, Representative desires to have the conflicting claims of Christys and Park-Lake relating to said real estate resolved without further expense or exposure to the said Estate and/or the beneficiaries thereof, and

WHEREAS, said *Christys believe they are entitled to enforce their Purchase Agreement* and they agree to undertake the expense of defense of the said Hennepin County District Court No. 771127, any other actions or claims related to said Hennepin County District Court No. 771127 and/or said transfer to Christys by Representative hereunder.

\* \* \* \* \* \*

2. Christys agree to indemnify and hold harmless the Estate of Arthur Springer, said Representative, and all heirs and devises of said Arthur Springer's Estate from and against any and all actions, proceeded, demands, claims, damages or other relief of any kind relating to or arising out of the acceptance by Representative of Christys' said Purchase Agreement *and the conveyance by Representative* pursuant thereto, or arising out of said District Court Action No. 771127, including but not limited to all attorneys fees and all other costs, expenses and damages relating in any manner to said claims, actions or demands.

\* \* \* \* \* \*

5. Christys *agrees to be bound* by the decision of the Court in Hennepin County District Court \* \* \* or any other related suit when finally determined and agree not to seek damages or other relief against Representative, the Estate of Arthur Springer, or *against the said heirs and devisees regardless of the final decision in any of said actions and do hereby release Representative*, the Estate of Arthur Springer and the heirs and devisees of said estate from any such claims or demands. (Emphasis supplied.)

 The trial court determined that "[Arthur] Springer and the Christys believed, as a matter of law, that Springer would prevail in the pending litigation. It is also apparent from the agreement that the consideration for the indemnity agreement was the contract for deed for the property." We agree.

To dispute this finding, Springer relies primarily on *Elk River Concrete Products Co. v. American Casualty Co.*, 268 Minn. 284, 129 N.W.2d 309 (1964), where the court stated: "The performance of an action by [the indemnitee] which it was not legally obligated to perform in exchange for [the indemnitor's] agreement to indemnify it in event of loss gives the required consideration." *Id.* at 294, 129 N.W.2d at 316.

*Elk River* is distinguishable. In that case, a surety on a federal bond agreed to additionally supply a statutory performance bond in exchange for a materialman's promise to indemnify it against all loss sustained on a public construction job. The court went on to state that even though evidence in the record suggested that the bank would have executed the performance bond as surety without the indemnify agreement, it "does not change the situation. Consideration appears as a matter of law." *Id.* at 294, 129 N.W.2d at 316.

Here, unlike *Elk River*, Springer (as indemnitee) did not perform the act bargained for in exchange for the Christys' agreement to indemnify. We do not accept Springer's contention that Arthur Springer's bona fide *attempt* to convey fully warrantable and marketable title was contemplated by the parties as sufficient consideration for the contract. Moreover, we find no merit to Springer's claim that the risk undertaken by the Christys provides con-

sideration for the indemnity agreement. Litigation in this matter was commenced by Park-Lake over two years prior to conveyance of the property to the Christys.

Springer also attempts to analogize the present case to a situation where claimants offer release of their claim in exchange for a settlement agreement. "[W]hile forbearance of a doubtful claim is sufficient to support a contract * * * 'a wholly baseless or utterly unfounded claim is not consideration.'" *Charles v. Hill*, 260 N.W.2d 571, 575 (Minn.1977) (quoting *Nybladh v. Peoples State Bank of Warren*, 247 Minn. 88, 96, n. 11, 76 N.W.2d 492, 498 n. 11 (1956)). Springer argues "[l]ike one who releases a dubious claim, * * * by entering into the contract with Christys, [Arthur Springer] was subjecting himself to * * * doubtful liability and the Christys [assumed] that liability through the indemnity agreement."

*Charles* is not on point. In that case, a will beneficiary agreed to forego filing of a claim against the estate in exchange for revival of his expired option to purchase the remainder interest. Here, by contrast, the focal question is not the genuineness of the claim but rather, what "claim" is Springer releasing in consideration for the Christys' agreement to indemnify. At the time the indemnity agreement was executed, Arthur Springer was aware of Park-Lake's intent to sue. Therefore, with or without the Christys' direct involvement, he would have been legally obligated to defend against the action. The only reasonable construction of the agreement is that Springer would convey fully warrantable and marketable title in exchange for the Christys' agreement to assume the financial liability of achieving that result.

*Mutual Mistake*

The trial court determined that:

It is undisputed that the Christys and [Arthur] Springer were laboring under a misapprehension of the law when they entered into the agreement, as shown by the Supreme Court decision. It is also undisputed that Springer is presently unable and will forever be unable to convey fully warrantable and marketable title pursuant to the agreement.

This is not the type of case where money damages can remedy a defect in contractual performance. The Christys contracted for a contract for deed for the property. Springer cannot perform his part of the bargain. The Court, pursuant to its equitable powers, rescinds the agreement between Springer and Christys. As recissions may be had on either the grounds of mutual mistake theory or a failure of consideration theory, the Court need not reach the issues of mistake of fact, misrepresentation or attorney misconduct.

 The preamble to the agreement, drafted by Springer's attorney, explicitly states that the Christys "believed" that the contract for deed was enforceable. Springer acknowledges this, but argues that the Christys assumed the risk as in *Carstedt v. Grindeland*, 306 N.W.2d 105 (Minn.1981). *Carstedt* is distinguishable since the parties in that case specifically addressed in their agreement who would assume the risk if a patent would not issue. Here, the agreement was silent and predictably so, since the parties believed, as a matter of law, that they would prevail in the litigation. We will not contort the indemnification agreement as placing the risk of an adverse judgment on the Christys when to do so would destroy the very essence of their bargain.

## VI.

 Springer argues that the Christys should be prevented from rescinding the agreement on grounds of promissory estoppel. We need not address this claim except to say that this particular issue was not properly raised before the trial court in post-trial motions. As recently stated by this court: "It is imperative the request for [a] new trial and the Rule 59.01 basis therefor * * * be stated explicitly and with specificity." *Eager v. Siwek Lumber & Millwork, Inc.*, 392 N.W.2d 691, 694 (Minn.Ct. App.1986) (quoting *Swartwouldt v. Swart-*

*wouldt,* 349 N.W.2d 600, 602 (Minn.Ct.App. 1984)).

## VII.

 When a contract is rescinded, the parties must be placed in a position as if the contract never existed. *See Koch v. Han-Shire Investments, Inc.,* 273 Minn. 155, 167, 140 N.W.2d 55, 63–64 (1966). To accomplish this, Springer must refund all monies paid by the Christys under the agreement. Springer's attempt to frame the issue as a refund of attorney's fees distorts the issue. Since rescission was proper, the source of the payments is not dispositive as long as the parties are restored to their former positions.

## VIII.

Propper Oil argues that the trial court erred in refusing to allow it credit for the value of improvements to the subject property. The trial court soundly addressed these arguments, finding the lease between Propper Oil and the Christys controlling. That lease provides in relevant part:

> If said Minnesota Supreme Court Case * * * has not been decided in Landlord's favor on or before April 1, 1984, this Lease shall be null and void, at Tenant's option. *Landlord shall not be liable to Tenant for damages or otherwise if said Case is decided against Landlord,* provided that Tenant shall have the right to remove any installations made by Tenant in such event. (Emphasis supplied.)

As succinctly stated in *U.S. Fire Insurance Co. v. Minnesota State Zoological Board,* 307 N.W.2d 490, 497 (Minn.1981), "equitable relief [based on unjust enrichment] cannot be granted where the rights of the parties are governed by a valid contract."

## DECISION

The trial court's denial of Park-Lake's claim for loss of use damages, restoration expense and reimbursement for real estate taxes, its recission of the indemnity agreement between Springer and the Christys

for failure of consideration and mutual mistake of law and fact, and its denial of Propper Oil's claim based on unjust enrichment were not clearly erroneous.

Affirmed.